UNITED STATES of America, Appellee,

v.

Antonio M. SMART, Appellant.

No. 95–3056.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 25, 1996.

Decided Nov. 1, 1996.

Lisa B. Wright, Assistant Federal Public Defender, argued the cause, for appellant. A.J. Kramer, Federal Public Defender, and Valencia R. Rainey, Assistant Federal Public Defender, Little Rock, AR, were on the briefs.

Steven E. Rindner, Assistant United States Attorney, argued the cause, for appellee, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, Washington, DC, were on the brief.

Before: EDWARDS, Chief Judge, WALD, Circuit Judge and BUCKLEY, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In 1995, appellant Antonio M. Smart was convicted by a jury on four different counts of violating federal law: (1) possession with intent to distribute five grams or more of crack cocaine (21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(iii)); (2) using or carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1); (3) carrying a pistol without a license in violation of D.C.Code § 22–3204(a); and (4) possession of an unregistered firearm (D.C.CODE § 6–2311(a)). On appeal, Smart challenges the validity of these convictions on three grounds. First, he claims that the police stop-and-frisk to which he was subjected in conjunction with his arrest was unsupported by reasonable and articulable suspicion, and therefore the district court erred by denying his motion to suppress the evidence gleaned from this search. Second, he argues that the trial court allowed the government's drug expert to answer a hypothetical question in violation of Federal Rule of Evidence 704(b). Third, appellant contends that his conviction for using or carrying a gun under 18 U.S.C. § 924(c) should be reversed due to an erroneous jury instruction. Appellant also challenges the sentence imposed on the grounds that the district court failed to recognize its authority to depart downward in his sentence under federal sentencing guidelines and policies.

Although we find that the expert witness' answer to a hypothetical question posed by the prosecution constituted improper expert testimony in violation of Rule 704(b), we also conclude that this error was harmless. In light of the overwhelming amount of properly admitted evidence indicating that Smart possessed a large quantity of crack cocaine with the requisite intent to distribute that cocaine and the virtual absence of any exculpatory evidence, it is not plausible that the district court's error under Rule 704(b) had a "substantial influence" on the jury. Similarly, we find that, although the district court's instruction to the jury on the meaning of "use" under 18 U.S.C. § 924(c) was clearly erroneous, this error was not prejudicial. Smart's other claims are without merit. Accordingly, we affirm all four convictions and reject appellant's challenge to his sentence.

## I. BACKGROUND

### A. Factual Scenario

On September 21, 1994, Officer Michael Tuz ("Officer Tuz") of the Metropolitan Po-

lice Department set up an observation post on the ground behind a small tree outside of the building located at 1503 Howard Road, S.E., Washington, D.C. At 9:30 p.m. on that day, Officer Tuz looked through his binoculars and observed appellant Antonio Smart walk over to a grassy strip near some trees and a building, where Smart reached down and picked up a plastic bag from the ground alongside the building. The plastic bag contained a "chunk of white—a white substance." Although Officer Tuz was approximately 30 feet away from appellant, the binoculars made it appear as though appellant were right next to him.

After picking up the plastic bag, appellant walked around the building and into a nearby parking lot, where he was out of Officer Tuz's line of sight. Officer Tuz radioed to a nearby arrest team that the suspect was a black man, wearing a black jacket, black shirt, and a black pair of pants and would be in the first parking lot near the street. Twenty-five to thirty seconds later, Officer Chris Huxoll ("Officer Huxoll") spotted appellant standing "midway" in the parking lot. Although there were a few other people standing further "back in the parking lot," Officer Huxoll did not notice them until after arresting appellant. According to the prosecution, appellant was the only person in the parking lot who matched Officer Tuz's radioed description.

Officer Huxoll drove up to appellant in an unmarked patrol car, identified himself as a police officer and asked appellant to put up his hands. Officer Huxoll then walked appellant over to the police car. Before Officer Huxoll could pat him down, appellant put his hands on his waistband. Officer Huxoll again asked him to put up his hands. Although appellant complied with this request at first, he immediately put his hands back on his waistband. While appellant's hand rested on his waistband, Officer Huxoll placed his hand on top of appellant's hand. Officer Huxoll felt a hard object and knew it was a gun.

A scuffle ensued, and two other officers assisted in securing appellant. The officers recovered a loaded 9–millimeter semiautomatic handgun from appellant. At this time, appellant told the officers that he carried the gun for protection because he had been shot recently. To prove his claim, he showed the officers his wound. In addition, the officers searched appellant and found a bag containing 25.55 grams of crack cocaine and 56 small ziplock bags in the pockets of his coat,[1] a pager, and $580 in small denomination bills. Officer Tuz, having left his original observation post, went around the back of the buildings to the parking lot and identified appellant as the individual who had retrieved a plastic bag with a white substance from the ground.

The defense called to the witness stand Theodore Clash ("Clash"), a self-employed mechanic with a criminal record for possession with intent to distribute PCP. Clash, an acquaintance of Smart, testified that on the night in question, Clash saw appellant walking across a playground on the sidewalk toward his car. He said he never saw appellant go towards any trees near the playground, as Officer Tuz had testified. Clash said that Smart approached him and asked him to get transmission fluid for Smart's car. Clash went to his apartment to check for the transmission fluid. When he returned to the parking lot, the police were searching Smart. Clash stated that, at that time, Clash was wearing a blue sweater, jeans and tennis shoes and that the police also stopped Clash, searched him and then let him go.

Appellant testified that, as he was driving home with his friend Richard after buying some cassette tapes, his station wagon was making a ticking noise, so he pulled into a parking lot near Richard's house. Richard got out and went into his house. Smart also went into the house and claimed to have gotten transmission fluid. After that, Smart claimed that he went into the house of a friend who lived next door to retrieve Smart's Polo sweater, but could not find his sweater, so he went back next door to Rich-

---

**1.** At various points in the testimony, the amount of crack cocaine found was said to be approximately 27 grams, or 25.5 grams, but the official amount, as testified to by the government's expert witness Detective Tyrone Thomas, was 25.55 grams. Transcript ("Tr.") II, at 50.

ard's house to get a jacket. He went into the bedroom where Richard was, asked for a jacket, was told to grab the one by the door, and did so, zipping it up and walking back out past the playground along the sidewalk in between his car and another car and put the transmission fluid in the car. Appellant noted that there were other people in the parking lot. The only time he talked to Clash, he said, was when he was putting the one bottle of transmission fluid in the car and yelled to Clash to get another bottle of fluid upstairs.

Smart claims that he was fiddling around with the transmission cap on his engine, when a couple of unmarked police cars drove into the parking lot. The officers grabbed two other persons who were standing outside. An officer in a white Chevrolet pulled up to Smart, got out of the car, and grabbed him. The officer started frisking appellant and stopped upon feeling a pager. Smart claims that the police officer, who hadn't identified himself as such, began to choke Smart. Other officers then came over to assist. Appellant testified that he did not have a gun on his person and that he did not see narcotics removed from his jacket. Smart also denied telling the police that he carried the gun for protection.

### B. *Procedural History*

On October 6, 1994, a grand jury indicted appellant for (1) possession with intent to distribute five grams or more of crack cocaine (21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(iii)); (2) using and carrying a firearm during and in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)); (3) carrying a pistol without a license (D.C.CODE § 22–3204(a)); (4) possession of an unregistered firearm (D.C.CODE § 6–2311(a)); (5) possession of unregistered ammunition (D.C.CODE § 6–2361(3)).

On February 1, 1995, the district court held an evidentiary hearing on appellant's motion to suppress. The trial judge denied Smart's motion. On February 3, 1995, a jury found Smart guilty on all counts except Count 5, possession of unregistered ammunition. The trial judge dismissed Count 5 at the close of all evidence. On May 12, 1995, Smart was sentenced to (1) 121 months of

incarceration to be followed by four years of supervised probation and a $50 special assessment on Count 1; (2) a consecutive term of 60 months of incarceration and a $50 special assessment on Count 2; (3) a concurrent term of one year of incarceration on Count 3; and (4) a concurrent term of one year of incarceration on Count 4. Appellant filed a timely notice of appeal on May 16, 1995.

### II. DISCUSSION

On appeal appellant claims that (1) the trial judge erred in denying appellant's motion to suppress the evidence, pursuant to the Fourth Amendment, because the police stop-and-frisk to which he was subjected in the parking lot was not supported by reasonable and articulable suspicion as required under *Terry v. Ohio,* 392 U.S. 1, 20–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); (2) the trial court violated Federal Rule of Evidence 704(b) by allowing the government's narcotics expert to answer a hypothetical question which mirrored the facts of the case and encompassed an element of the crime charged; (3) appellant's conviction under 18 U.S.C. § 924(c) must be reversed because of an incorrect jury instruction; and (4) this case should be remanded for resentencing because the record indicates that the district court did not recognize its authority to depart downward pursuant to U.S.S.G. § 5K2.0 and the Sentencing Commission's Special Report to Congress on Cocaine and the Federal Sentencing Policy. We find appellant's objection to the expert witness's answer to the government's hypothetical question to have merit. Nonetheless, we conclude that any error was harmless and therefore affirm his conviction for possession with intent to distribute. In addition, although the jury instruction on "use" of a firearm was erroneous, we find that this error was also harmless and thus affirm the conviction for carrying a gun in relation to a drug offense. Appellant's other claims are without merit.

### A. *District Court's Denial of Appellant's Motion to Suppress*

Appellant argued to the trial court that the police did not have enough information under

the Fourth Amendment to support a *Terry* stop of appellant on the night of September 21, 1994. Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may, even without probable cause, stop and briefly detain a suspect if the officer has a reasonable suspicion supported by specific, articulable facts that the suspect is involved in some sort of criminal activity. Further, an officer may frisk such a suspect if the officer has a reasonable, articulable suspicion that the suspect in question may be armed and dangerous. Applying this standard, the trial judge found that:

> While the testimony of Officer Tuz was not a model of clarity, I think it was a sufficient broadcast on his part from his observations of the defendant to justify a *Terry* stop by Officer Huxoll at the other end of the wire. And once [Officer] Huxoll had the right and articulable suspicion to conduct a *Terry* frisk, he had the right to search and come across the gun, he had the just—he had a reason to arrest the defendant, and the pager and the money and the cocaine are all properly incident to a lawful arrest.

Tr. II, at 75–76.

 Appellant claims that the district court erred in denying appellant's motion to suppress. It is appellant's contention that Officer Huxoll's "*Terry* stop" and "*Terry* frisk" of Smart was unlawful.[2] The legality of a stop or frisk is evaluated under the totality of the circumstances, *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989), and this court will "look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious." *United States v. McKie*, 951 F.2d 399, 402 (D.C.Cir.1991).

 According to appellant, the "*Terry* stop" was unlawful because the radio broadcast was too vague in its physical description of the suspect. There were other people matching the suspect's description nearby, and at least two other individuals in the area were stopped by the police. In addition, the "*Terry* frisk" was illegal because the radio broadcast gave no facts providing a basis for a reasonable and articulable suspicion that the suspect was armed and dangerous or that the officer's safety was in danger. The broadcast failed to disclose the nature of the illegal activity and failed to give any reference to a gun, knife, or any other weapon. Thus, Smart argues, a reasonably prudent officer would not have believed appellant to be "armed and dangerous."

The government contends that the "*Terry* stop" was justified because it was based on a reasonable suspicion supported by articulable facts that appellant was involved in criminal drug activity. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). The reason Officer Tuz set up the observation post at that location was to investigate illegal narcotic activity. Prior to observing appellant pick up the plastic bag, Officer Tuz had observed an apparent narcotic transaction in the building across the street. Furthermore, Officer Huxoll's subsequent stop of appellant was also justified. Appellant was the only person in the area that matched the description of a black man wearing all black in the exact location specified by Officer Tuz. The inclusion of a specific time and specific location is what makes the government's contention persuasive.

 Under *Terry*, officers may also frisk persons that they stop, if they can articulate facts supporting a reasonable belief that "criminal activity may be afoot and that the

**2.** Appellant cites to *United States v. Board*, 744 F.Supp. 6 (D.D.C.1990), for support. In *Board*, the court held that officers who stopped the defendant lacked reasonable suspicion that he was engaged in or had engaged in criminal activity, and thus seizure of defendant violated his Fourth Amendment rights. In addition, such seizure tainted his alleged consent to search of his automobile, where officers were acting on the ground that defendant fit a very general description of a juvenile wanted in a custody dispute and was parked across the street from the apartment building where police had looked for the juvenile the previous day. The present case is distinguishable because the police officers radioed a description of the appellant and gave the exact time and place where he could be located. Within twenty-five to thirty seconds of the broadcast, Officer Huxoll spotted appellant. Moreover, despite Smart's claim to the contrary, there were no other persons in that area at that time matching the suspect's description.

persons with whom [they are] dealing may be armed and presently dangerous." *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884. In the circumstances here, where Officer Tuz had just observed what he believed to be a suspect engaged in a drug transaction, it was reasonable for the officers to suspect that appellant had a gun to protect himself and his drugs. Moreover, when Officer Huxoll repeatedly asked appellant to raise his hands, appellant moved his hands to his waistband leading the officer to suspect appellant was armed. As the Supreme Court noted in *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), *Terry* authorizes "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information," and permits a "limited search ... not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." Thus, the trial court was entirely justified in denying appellant's motion to suppress.

B. *Expert Opinion Testimony*

■ Appellant claims that the government violated Federal Rule of Evidence 704(b)[3] because the government's drug expert gave opinion testimony to hypothetical facts identical to the facts of the case and testified that the elements of the offense, including—inferentially—intent, were present. The testimony of Detective Thomas, the government's drug expert, went as follows:

Prosecutor: Now, Detective, I'm going to ask you a hypothetical question and I'm going to ask you to tell us with what—what you think about the activities in the hypothetical question as an expert. A person is observed walking directly to a spot located next to a building. That person picks up a large white, rock-like substance wrapped in plastic. Within minutes that same person is stopped and that person has a large, white, rock-like substance on him in plastic. In fact, it's 25.5 grams that turns out to be cocaine base. He also has

a pager, $580 in small denomination bills, 56 empty Ziploc bags, and a 9 millimeter handgun. With what activity are these—this person's actions consistent, in your opinion?

Defense Attorney: Objection, Your Honor. Object to the form of the question. It's not a hypothetical.

The Court: I'll permit it. Go ahead. Can you answer that, Sergeant?

Detective Thomas: Yes, Your Honor.

The Court: Do you have an opinion? Now, what is your opinion?

Detective Thomas: My opinion from listening to the hypothetical that was given to me, that individual is involved in a drug operation. He met the elements: He went to a stash area, a place that he controlled and removed an item. Later it was determined that he had 25.55 grams of crack cocaine; and as you mentioned, some Ziploc envelopes. Money that's consistent with what a drug user—I'm sorry, drug dealer would have on the streets of Washington, D.C. And also a weapon that would be used to protect the drug operation. It would sound to me that someone was in the business of making drugs—making money by selling drugs on the streets of Washington, D.C.

Defense Attorney: Your Honor, I'm going to object to that testimony and move to strike it. The witness just testified to the elements of the defense. He's not a lawyer. He can't give testimony to that effect.

The Court: I'll permit it. Do you have any questions of this witness?

Tr. II, at 58–59.

Appellant relies on *United States v. Boyd,* 55 F.3d 667 (D.C.Cir.1995), a case in which this court held that an expert's assertion at trial—that "hypothetical" facts exactly mirroring alleged facts of defendant's arrest showed "possession with intent to distribute," rather than possession for personal use—

---

**3.** Rule 704(b) provides that:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

FED.R.EVID. 704(b).

violated Rule 704(b)'s prohibition on expert witnesses stating an opinion as to whether the defendant had the necessary mental state constituting an element of the crime charged. Appellant claims here that the trial court allowed Detective Thomas to testify in the manner forbidden in *Boyd*. Thomas told the jury that the hypothetical individual "met the elements" of being "involved in a drug operation," "in the business of making drugs— making money by selling drugs on the streets of Washington, D.C.," and his possession of drugs, drug paraphernalia and money were "consistent with what a ... drug dealer would have on the streets of Washington, D.C." Appellant claims that, since "involve[ment] in a drug operation" and possession "of articles consistent with what a ... drug dealer would have," necessarily encompasses an intent to distribute narcotics, Thomas did in fact testify to an ultimate issue in the case in violation of Rule 704(b). Moreover, appellant argues that Detective Thomas's statement that the defendant "met the elements" of being involved in drug dealing implicitly referred to the statutory element of intent required to convict a defendant of possession with intent to distribute five grams or more of crack cocaine under 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii).

The government, on the other hand, contends that Detective Thomas did not testify to the intent or mental state of appellant, but only to the *modus operandi* of a participant in a drug operation. The government contends that Thomas's use of the word "elements" was only a reference to the elements of a "drug operation," not a reference to the formal elements of the charged offense. The government attempts to distinguish this case from *Boyd* by noting that neither the prosecutor nor the expert testifying in this case actually used the word "intent" or its equivalent when explaining what activity could be inferred on the part of the "hypothetical" defendant. In *Boyd*, the prosecutor hypothesized the existence of a person identical in every relevant respect to the defendant in that case, then asked the expert whether "that person's possession" was "possession for personal use" or "possession with intent to distribute." *Boyd*, 55 F.3d at 670. Thus, the prosecutor there was not just explaining

what kind of drug *activity* might be inferred from the hypothetical presented, but went one step further to tell the jury that the person at issue had the *intent* to distribute drugs.

The government also points out (in a footnote) that, following the questionable expert testimony at Smart's trial, defendant's counsel asked the police expert on cross-examination whether the expert possessed any "information with respect to the facts of this particular case," to which the officer replied that he did not. The government noted that, in *United States v. Williams*, 980 F.2d 1463 (D.C.Cir.1992), the court upheld a conviction despite testimony that appeared to constitute a violation of Rule 704(b), reasoning that the expert's testimony would have been "troubling" but for the fact that the district court had emphasized to the jury that the expert had no first-hand knowledge about the case. *See id.* at 1466.

■ This court reviews a trial judge's admission of evidence for abuse of discretion. *See, e.g., United States v. Salamanca*, 990 F.2d 629, 637 (D.C.Cir.), *cert. denied*, 510 U.S. 928, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993). Applying this standard of review, we are of the opinion that this case presents a close question under Rule 704(b). On the one hand, the vast majority of cases in this and other circuits finding a Rule 704(b) violation involve situations in which the prosecutor, the expert, or both used the actual word "intent" in describing the conduct of the individual posed in a hypothetical. In *Boyd*, the prosecutor asked whether the facts given (which mirrored the actual case before the jury) were consistent with "possession [of drugs] for personal use or ... possession with *intent* to distribute." 55 F.3d at 670 (emphasis added). The expert, in turn, opined that the facts suggested "[p]ossession with *intent* to distribute." *Id.* (emphasis added). Similarly, in *United States v. Mitchell*, 996 F.2d 419 (D.C.Cir.1993), the court found the expert testimony to "cross the line" in violation of Rule 704(b) when both the prosecutor and the expert used the word "intent" when asking about and evaluating a hypothetical person's actions that mirrored

the alleged actions of the actual defendant.[4] Although use of the word "intent" clearly violated the rule, the *Mitchell* court made clear that "Rule 704(b) allows an expert to state that certain conduct fits a specific role in a criminal enterprise—even though the conduct described exactly parallels conduct that other evidence explicitly links to a defendant." *Id.* And in *United States v. Williams*, 980 F.2d 1463 (D.C.Cir.1992), the court found that, in the absence of an admonition to the jury by the trial judge that the expert possessed no actual knowledge of the case before it, it would be "troubling" for the prosecutor to ask about "the *intentions* of the person who possessed those [ziplock] bags," and to have the expert reply that possession of the bags indicated that the drugs "were meant to be distributed at street level." *Id.* at 1465 (emphasis added by district court).[5] In all of these cases, however, the actual word "intent" was used by the prosecutor and/or the expert to describe conduct mirroring that ascribed to the defendant.[6]

On the other hand, some courts have warned that the Rule 704(b) inquiry should not be allowed to degenerate into formalism and that the actual use of the word "intent" should not be the dispositive factor in finding a Rule 704(b) violation. As the Seventh Circuit explained in *United States v. Lipscomb*, "though officers did not in fact say 'intent' or 'intended' [in the case before the court,] they might as well have, for the effect would have been exactly the same." 14 F.3d at 1240. The court reasoned that,

> [i]f the drugs found on Lipscomb "were for street-level distribution," as each of the officers testified, then Lipscomb possessed them for that purpose; he intended to distribute them. Further, it would seem to make little difference that the officers' opinions were based on an analysis of the external circumstances of the arrest, for the officers still would have "state[d] an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged," and this is what the rule forbids.

*Id.* at 1240–41. Similarly, in the present case, where the jury heard the officer's testimony that "hypothetical" behavior exactly mirroring Smart's alleged behavior was consistent with having "met the elements" of "making money by selling drugs," it is more than plausible to posit that the officer might as well have stated that such a person (clearly meaning Smart himself) *intended* to distribute drugs for a profit in violation of the statute. The use of the word "elements," in particular, carries legal connotations that could have misled the jury into thinking that Detective Thomas was speculating on the ultimate legal issue of whether Smart had the requisite intent to distribute drugs.

---

**4.** *Id.* at 422. The prosecutor asked what "the packaging of that crack cocaine into nine individual ziplocks tell[s] you about the intent of the person that was carrying those ziplocks," and the expert responded that such evidence indicated that "[i]t was intent to distribute." *Id.*

**5.** The *Williams* court found the statements about "intent" problematic, even though they were directed at the purpose for which the bags were designed, rather than the intent of the defendant *per se.*

**6.** *See also United States v. Speer*, 30 F.3d 605, 610 (5th Cir.1994) (interpreting *United States v. Dotson*, 817 F.2d 1127 (5th Cir.1987), *aff'd in pertinent part on reh'g*, 821 F.2d 1034 (1987), to stand for the proposition that "Rule 704(b) is not strictly construed and prohibits only a direct statement of the defendant's intent") (citations omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995); *United States v. Hunter*, 95 F.3d 14, 16, 17 (8th Cir.1996) (upholding expert testimony that a 14.76 gram quantity of cocaine base " 'would definitely be involved in distribution versus personal use' " and concluding that "[e]xpert testimony that a certain quantity of drugs suggests distribution is admissible"); *United States v. Lipscomb*, 14 F.3d 1236, 1239 (7th Cir.1994) ("[Courts] have found it significant whether the expert actually referred to the intent of the defendant or, instead, simply described in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent."); *United States v. Brown*, 7 F.3d 648, 653 n. 2 (7th Cir.1993) ("[I]f [the expert] had responded that the circumstances suggested that this cocaine probably would be distributed, there would be no Rule 704(b) issue. It is only the expert's use of the world 'intended' that implicates the rule.").

Troubled by the difficulty of discerning a coherent principle from the potpourri of cases, several courts have looked to the underlying purposes of Rule 704(b), and we do likewise here. Although the Rule was originally enacted to place a limitation on psychiatric testimony when a criminal defendant relies upon the insanity defense, *see* S. REP. No. 225, 98th Cong., 1st Sess. 230–31 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3412–13, it is now well-established that Rule 704(b) applies to all cases in which an expert testifies as to a mental state or condition constituting an element of the crime charged or defense thereto. *See, e.g., United States v. Boyd*, 55 F.3d 667, 671 (D.C.Cir.1995); *United States v. Lipscomb*, 14 F.3d 1236, 1242 (7th Cir.1994). The legislative history of the Rule suggests that it was aimed at ameliorating "the danger associated with mental health testimony ... that the expert, who is qualified only to explain medical concepts, will be called upon to interpret legal ones." *Lipscomb*, 14 F.3d at 1242. The Seventh Circuit opined that "[n]o similar danger arises from the testimony of law enforcement experts because, by definition, they are qualified to identify illegal behavior and to distinguish among its various forms." *Id.* Nevertheless, that court recognized that the Rule also serves an important purpose with regard to the so-called *modus operandi* testimony of law enforcement officers, where "[t]he central danger" is that "the jury may attach 'undue weight' to the officer's testimony, either by mistaking an expert opinion for what is really only an eyewitness observation, or by inferring that the officer's 'opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial.'" *Id.* (quoting *United States v. Alvarez*, 837 F.2d 1024, 1030 (11th Cir.), *cert. denied*, 486 U.S. 1026, 108 S.Ct. 2003, 100 L.Ed.2d 234 (1988) (other citations omitted)).

■ To avert the danger that jurors will rely unduly on a law enforcement officer's expert testimony, the Seventh Circuit articulated the following standard to be applied in Rule 704(b) cases in which a police officer's expert testimony is at issue:

> [S]uch testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes. Relevant in this regard, though not determinative, is the degree to which the expert refers specifically to the intent of the defendant, for this may indeed suggest, improperly, that the opinion is based on some special knowledge of the defendant's mental processes.

*Id.* at 1242–43 (citation omitted). Under this standard, a court should assess two key elements in deciding whether expert testimony violates Rule 704(b): (1) the language used by the questioner and/or the expert, including use of the actual word "intent"; and (2) whether the context of the testimony makes clear to the jury that the opinion is based on knowledge of general criminal practices, rather than "some special knowledge of the defendant's mental processes."

We find that the Seventh Circuit standard accurately encapsulates the law up to this point in this circuit as well. It avoids any talismanic reliance on whether or not the prosecutor or expert used the word "intent" in order to determine whether a violation of Rule 704(b) has occurred, and it also recognizes the importance of ensuring that the jury does not place undue weight on expert testimony pertaining, expressly or impliedly, to the intent of the defendant. Applying this standard to the present case, we conclude that Rule 704(b) was violated when the expert used the phrase "met the elements" in analyzing a hypothetical that was a "carbon copy" of the alleged factual scenario. Unlike most cases finding a violation of Rule 704(b), including *Boyd*, the prosecutor here did not actually use the word "intent" in questioning the officer, nor did the officer use the word "intent" in his answer.[7] But this fact alone

---

**7.** In *Boyd*, the government lawyer asked the officer whether the hypothetical facts posed were "consistent with" possession or possession with intent to distribute, whereas, in this case, the prosecutor merely asked "with what activity" it was consistent. In *Boyd*, the predictable answer was possession with intent, and in this case, the

cannot be dispositive. Although Detective Thomas was not testifying explicitly as to the legal "elements"—including the *mens rea* element—of the crime of possessing drugs with the intent to distribute those drugs, the word "elements" must almost certainly have been associated in the jury's mind with the statutory "elements" of the alleged crime, including the "element" of intent. Thus, despite the fact that neither the prosecutor nor the expert explicitly used the word "intent," the context of the interchange and the use of other words connoting intent added up to a Rule 704(b) violation.[8]

Because the word "intent" was not used by the prosecutor or the expert, however, a Rule 704(b) violation could have been avoided under the *Lipscomb* standard if the court or the prosecutor had made clear to the jury that the expert was not qualified to testify as to the ultimate issue of intent.[9] But the jury that convicted Antonio Smart was not notified adequately that Detective Thomas was not testifying with regard to the actual facts of this case. The district court failed to intervene when the detective explained that the individual in the hypothetical mirroring Smart's case "met the elements" of involvement in drug dealing. The district court or the prosecutor should have made clear to the jury that the detective was not allowed to draw any ultimate conclusions on statutory elements of a crime since "ultimate issues" were reserved for the jury alone.[10] However, this fact was not explained by the district court or by the prosecutor at the time that Detective Thomas actually drew his conclusions about the hypothetical facts; in fact, the district court overruled the defendant's objections to the testimony.[11] Consequently, it was never "made clear, either by the court expressly or in the nature of the examination," that the detective's implicit reference to the hypothetical individual's intent to distribute drugs "[was] based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes." *United States v. Lipscomb*, 14 F.3d 1236, 1242 (7th Cir.1994). In the absence of such safeguards, we find that the expert's testimony violated Rule 704(b).

Since the detective's answer to the prosecutor's mirroring hypothetical was objected to below by defendant's counsel, the final issue is whether the error in allowing it into evidence was harmless.[12] Federal Rule of Criminal Procedure 52(a) provides that: "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall

---

"activity" was described as "the business of making drugs—making money by selling drugs."

**8.** We were comforted to learn from government counsel at argument that the government no longer engages in posing such mirroring hypothetical questions to its experts at trial. We are thus confident this case represents the end of the line on this problematic practice. We note also that this case was tried before our opinion in *Boyd* highlighted the danger of such questioning.

**9.** *See, e.g., United States v. Askew*, 88 F.3d 1065, 1069 (D.C.Cir.1996) (explaining, in dictum, that it would be problematic for an expert to testify that a certain quantity of drugs "was intended to be sold on the streets of Washington for a profit for a drug dealer" in part because "the district court made no corrective interjection to ensure that the jury did not think that the prosecution's expert was testifying that [the defendant] in particular intended to distribute the cocaine base"); *United States v. Williams*, 980 F.2d at 1466 (noting that a question by the prosecutor about a hypothetical person's intent would be problematic absent "intervention" by the trial court to make clear that the officer testifying had no actual knowledge of the case before the court).

**10.** It is true that the defendant's attorney, in cross-examining the detective, asked whether he had any "information with respect to the facts of this particular case," to which the detective replied that he did not. Tr. II, at 60. However, it may not have been clear at all to the jury that this statement referred back to the mirroring hypothetical put forth by the prosecutor.

**11.** In contrast, in *United States v. Williams*, the district court intervened almost immediately after the prosecutor and police officer referred to the intentions of the hypothetical individual, explicitly asking the officer: "You aren't referring and you have no knowledge, I take it, about this particular case?"—to which the officer replied: "That's correct." 980 F.2d at 1465.

**12.** In contrast, in cases where the defendant failed to object to the question or answer at trial, any error is reviewed under the "plain error" standard. *See, e.g., United States v. Mitchell*, 996 F.2d 419, 422 (D.C.Cir.1993) (explaining plain error standard); *United States v. Askew*, 88 F.3d 1065, 1068 (D.C.Cir.1996) (error in allowing expert opinion as to intent held not plain error).

be disregarded." FED. RULE.CRIM. P. 52(a). When a court is engaging in direct review of a nonconstitutional trial error, it must determine "whether the error 'had a substantial or injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see also United States v. Smith,* 77 F.3d 511, 515 n. 1 (D.C.Cir.1996) (proper measure of harmlessness is whether error had "substantial and injurious effect" on verdict). In deciding whether the error had such an effect, the court must consider both the severity of the error and the trial record as a whole. In cases where the error is fundamental, or where the other, admissible evidence against the defendant is ambiguous, a court will almost always conclude that the error affected the verdict.[13] If the judge is in "grave doubt" about the harmlessness of the error, he or she must reverse the conviction. *O'Neal v. McAninch,* —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). At all times, the burden of proving that an error was not prejudicial rests on the government. *See, e.g., United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993) (government bears the burden of showing that an error was not prejudicial and therefore harmless).

■ Applying this standard here, we find that the government has met its burden in showing that the Rule 704(b) violation committed at trial was harmless error. The totality of properly admitted evidence—demonstrating both Smart's possession of the drugs and his intent to distribute those drugs—was weighty and not at all ambiguous. Although Smart was not observed in any communication or transaction with anyone else, there was substantial evidence linking him to drug dealing, including police observations at the scene, as well as his possession of money, 25.5 grams of crack cocaine, ziplock bags, a pager, and a gun—all the classic accessories of a drug dealer.[14] In addition, the direct evidence was supplemented by the entirely proper portion of the expert's testimony addressing the *modus operandi* of drug dealers.[15]

Moreover, there was a virtual absence of exculpatory evidence. Appellant's defense was that the drugs found on his person did not belong to him at all, that he had been wearing someone else's jacket and was unaware of the contents of its pockets. He claimed that he was not the person the police officer saw pick up drugs shortly before his apprehension. He also contended at trial that the police were lying about finding a gun in his waistband when they searched him. However, appellant failed to present any evidence directly supporting these contentions, whereas there was ample evidence that contradicted his assertions. Several different police officers testified that, at the time of the arrest, they found a gun in his waistband.

---

**13.** Indeed, structural errors, such as complete deprivation of the right to counsel or trial by a biased judge, are *per se* prejudicial and lead to automatic reversal of a conviction. *See, e.g., Arizona v. Fulminante,* 499 U.S. 279, 309–310, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991); *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (jury instruction on meaning of reasonable doubt that violates Constitution may never be harmless error). But most errors, such as the one at issue in this case, are classified as "trial-type errors" and are subject to harmless error review.

**14.** In another context, we have stated that "juries may infer an intent to distribute not only from possession of drug packaging paraphernalia, but also from the presence of firearms," because these items are tools of the drug trade just as surely as the drugs themselves. *United States v. Dunn,* 846 F.2d 761, 763 (D.C.Cir.1988).

**15.** Indeed, prior to answering the prosecution's hypothetical with the forbidden reference to the "elements" of drug distribution, Detective Thomas had already produced abundant and lawful testimony as to the parts played by "stashes," ziplock bags, pagers, weapons, large amounts of cash in small-denomination bills, and large quantities of crack cocaine in the drug distribution underworld. Detective Thomas explained the $20 dose-by-dose habit of the typical crack user. He noted that the amount of cocaine found on Smart would have generated about 178 individual dose bags of crack, with a street value of approximately $3,560. He told of the implausibility of any crack "user" possessing 178 doses for personal use. At the closing argument, the prosecutor repeated all of this evidence again—about the large amounts of cash and drugs, the ziplock bags, the pager, the gun, the practice of "stashing" drugs.

They testified that the appellant told them he carried the gun for "protection" since he had been shot recently and that he showed the officers his gunshot wound in order to prove his point. Additionally, although Smart testified that the reason for his presence in the parking lot was that he was picking up transmission fluid from an adjacent house where his friend Richard lived, he did not call this friend to the stand at trial as a witness to corroborate his story about the transmission fluid or about the purportedly "borrowed" jacket.[16]

Most importantly, it is excruciatingly clear that the jury did not believe Smart's story. As previously explained, his only defense was that the drugs were not his and that the police had lied about finding the gun on his person. But if the jury had believed his tale, they would surely have had to find him not guilty, and the expert testimony which simply characterized behavior he denied outright as consistent with "the elements" of drug distribution would have been totally discounted or found irrelevant. Once we assume that the jury believed the evidence linking Smart to the drugs, the gun, and the other paraphernalia, the violation of Rule 704(b) represented by the expert testimony could hardly have been crucial to the jury's secondary inference that Smart's possession of cocaine was accompanied by the requisite intent to distribute the drugs. Smart himself never produced any evidence or even suggested that his intent was not to distribute the cocaine found in his possession. His principal contentions that the drugs were not his and that there was no gun in no way related to any separate defense that he did not have the requisite intent to distribute drugs. In light of the totality of the properly admitted evidence, as well as the fact that the violation of Rule 704(b) here was not such a fundamental or pervasive error so as to taint the

overall fairness of the trial, we conclude that the erroneous inclusion of expert testimony in violation of Rule 704(b) did not have "a substantial and injurious effect or influence in determining the jury's verdict," and therefore was harmless.

■ We emphasize, however, that the harmless error test we apply here is not a mere sufficiency-of-the-evidence inquiry. An appellate court may not usurp the jury's role as the arbiter of guilt or innocence. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) ("The [harmless error] inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence."); *see generally* Harry T. Edwards, *To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L.Rev. 1167 (1995). Of course, in deciding whether an error has had substantial influence on the jury, a reviewing court cannot help but look at the totality of lawful evidence presented at trial. *Kotteakos*, 328 U.S. at 763–64, 66 S.Ct. at 1247–48.[17] And if, as here, the lawful evidence against the defendant is overwhelming and the trial error is not a fundamental one, the error should be deemed harmless. *See, e.g., United States v. Shyllon*, 10 F.3d 1, 4 (D.C.Cir.1993) (Confrontation Clause violation harmless in light of the "overwhelming *direct* evidence supporting [defendant's] conviction") (emphasis in original), *cert. denied*, 510 U.S. 1206, 114 S.Ct. 1327, 127 L.Ed.2d 675 (1994).

On the other hand, if the evidence presented at trial is ambiguous, even a relatively minor error requires reversal. In *O'Neal v. McAninch*, —— U.S. ——, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), the Supreme Court held that in cases "where the record is so evenly

---

16. At trial, Smart conceded that he had never gone back to the neighborhood to look for Richard. Smart claimed he had "called and tried to get in touch with [Richard]" but had been unable to reach him. Tr. III, at 15. He also claimed that he had told an investigator about Richard, but that the investigator was not able to locate him to issue a subpoena. Tr. III, at 16.

17. *See also Everette v. Roth*, 37 F.3d 257, 262 (7th Cir.1994) ("Insofar as possible the habeas or appellate court shuns resolving credibility and weighing the evidence. Nevertheless, the *Brecht–Kotteakos* test for harmless error requires the habeas court to evaluate to some extent the probability of the outcome if the case were tried under proper instructions."), *cert. denied*, —— U.S. ——, 115 S.Ct. 2620, 132 L.Ed.2d 862 (1995).

balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the judge cannot find a trial error to be harmless. *Id.* at ——, 115 S.Ct. at 995. Indeed, in a case where the evidence at trial is conflicting or ambiguous, the danger that an error will affect the jury's verdict is almost always substantial. As we stated in *United States v. Boyd,* "where the facts offered at trial are at best ambiguous as to the defendant's role in alleged criminal activity, *expert* testimony on the ultimate issue of fact is likely to have a powerful effect on the result." 55 F.3d at 672 (emphasis in original). We further explained that, if a jury is already uncertain about a defendant's guilt or innocence, but hears testimony from an expert witness "who claims to know the defendant's state of mind," then "the jurors may rely on the purported expertise of the Government witness to cure the ambiguity that they face." *Id.*[18] Thus, if the other evidence presented in this case had been even slightly ambiguous, we would be required to reverse Smart's conviction. It is only because we find that—especially in light of the absence of any convincing exculpatory evidence or theory of the defense—the overall evidence supporting Smart's conviction is overwhelming and not at all ambiguous, that we find this troublesome violation of Rule 704(b) to be harmless.

## C. *Jury Instruction on "Use" of a Gun*

■ Count 2 of the indictment charges appellant with using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1).[19] Appellant accurately notes that the court incorrectly gave the jury an overbroad definition of the essential elements of using or carrying a weapon in relation to a drug trafficking offense, a violation of 18 U.S.C. § 924(c)(1). The court's instructions to the jury were:

The second count of the indictment, charges the defendant with the knowing use and carrying of a firearm during and in relation to a drug-trafficking offense, that is, the offense set forth in count 2 of the indictment.

The essential elements of this offense, namely, count 2, which the government must prove beyond a reasonable doubt, are that the defendant used or carried a firearm; that he did so knowingly and intentionally; that he did so during and in relation to a drug-trafficking crime.

You are instructed that the word "use" can mean any use, such as the maintenance of a firearm for security or protection purposes. The government need not show that the defendant actually employed the firearm or that the firearm was fired. It is sufficient to show that the defendant actually or constructively possessed the firearm in order to prove that he used it.

Since these instructions were consistent with the case law at the time, the defense counsel did not object, and any objection he raised would have been futile.

During jury deliberations, the jury forwarded a note to the court. The note asked two questions: (1) "Is possession with intent to distribute cocaine base a drug-trafficking crime?" and "if not, what is a drug-trafficking crime?"; and (2) "What is meant by knowingly used a firearm?" The court responded by saying, "You've answered the question. Of course possession with intent to distribute cocaine is a drug-trafficking crime." With respect to the jury's second question, the court said:

I have previously instructed you that the word "use" can mean any use such as the maintenance of a firearm for security or protection purposes. And I've previously instructed you that an act is done knowingly if it is done voluntarily and purposely,

---

18. *See also United States v. Anderson,* 851 F.2d 384, 393 (D.C.Cir.1988) ("[T]here is often an inherent danger with expert testimony unduly biasing the jury 'because of its aura of special reliability and trust.'") (quoting *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir.1973)), *cert. denied,* 488 U.S. 1012, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989).

19. Section 924(c)(1) provides in relevant part:

Whoever, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, shall, in addition to the punishment provided for such crime . . ., be sentenced to imprisonment for five years. . . .

18 U.S.C. § 924(c)(1) (1994).

and not because of mistake, inadvertence or excuse. In other words, the act of using a firearm means—includes the maintenance of a firearm for security or protection purposes, not because of mistake, accident, inadvertence or accident. It means to be done voluntarily, intentionally and purposely.

Clearly, the trial judge's jury instruction on the "use" prong of the weapons possession in relation to a drug trafficking charge was erroneous in light of the Supreme Court's subsequent decision in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995),[20] which held that for a conviction under the "use" prong of § 924(c), the government must prove that the defendant "actively employed" the firearm during and in relation to the predicate crime, since Congress intended to "require more than possession to trigger the statute's application." *Id.* at ——, 116 S.Ct. at 509. Under the supervening-decision doctrine, we apply *Bailey* retroactively to vacate any prior conviction in which such an instruction was given where it might have caused the jury to conclude that the defendant's awareness of and proximity to a gun nearby in a drug transaction constituted a forbidden "use" of the gun. *See, e.g., United States v. Washington,* 12 F.3d 1128, 1139 (D.C.Cir.1994) (court will consider issue not raised at trial "where a supervening decision has changed the law in appellant's favor and the law was so well-settled at the time of trial that any attempt to challenge it would have appeared pointless"); *United States v. McKie,* 73 F.3d 1149, 1153 (D.C.Cir.1996) (judicial construction of a statute is retroactive and relates back to the time of the statute's enactment).

The government, however, contends that in this case the error was harmless, because the jury found the appellant guilty of a separate count of carrying a pistol without a license, in violation of D.C.Code § 22–3204(a) (Count 3), a charge which necessarily had to include the finding that the appellant "carried the pistol openly or concealed on or about his person [and] that he carried the pistol knowingly and intentionally—that means consciously, voluntarily and on purpose, and not by mistake or accident." Brief for Appellee, at 28 (quoting trial court's instructions to the jury). The government's evidence showed conclusively that the firearm was found on his person in his waistband. Thus, the government argues, when the jury found that appellant "carried" a firearm within the meaning of D.C.Code § 22–3204(a),[21] the jury must necessarily have found the appellant "carried" a firearm within the meaning of 18 U.S.C. § 924(c)(1). For this reason, the error in the "use" instruction was harmless.

We agree. All of the police officers involved in Smart's arrest testified consistently at trial that they found a semiautomatic handgun in his possession when they patted him down during the *Terry* stop-and-frisk. Clearly, the jury found this testimony credible and therefore found Smart guilty on the charge of violating D.C.Code § 22–3204(a). Concomitantly, it is clear that the jury did not find credible Smart's contention that he did not have a weapon on his person at the time of his arrest. The only other possible scenario suggested by appellant's counsel in which he could have been properly convicted under the D.C.Code while simultaneously improperly convicted under the federal "use" or "carry" provision was quite implausible.[22]

---

**20.** This Supreme Court decision reversed our *in banc* decision in *United States v. Bailey,* 36 F.3d 106 (D.C.Cir.1994).

**21.** This provision provides in pertinent part that:

No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed. . . .

D.C.Code § 22–3204.

**22.** At oral argument, defendant's counsel suggested a scenario in which the jury might have

concluded that the defendant "carried" a gun in violation of D.C.Code § 22–3204, while at the same time concluding that he did not "carry" a gun in violation of § 924(c)(1). Counsel posited that there could have been two different packages of drugs at issue, one that defendant allegedly picked up by the trees, and one that was allegedly found inside the defendant's jacket in the parking lot. The jury could have believed the evidence about the drugs by the trees, while at the same time disbelieving the evidence that defendant had drugs on him in the parking lot. Since the only evidence presented as to defendant's possessing a firearm was in the parking lot, not by the trees, the jury could only have

Under § 924(c), Smart's knowing possession of the handgun at the time of his arrest, and his subsequent conviction for possessing more than five grams of cocaine with intent to distribute, are sufficient to support a conviction for "carrying" a firearm "during and in relation to ... [a] drug trafficking crime." Accordingly, we conclude that the improper jury instruction as to the meaning of "use" under § 924(c) was harmless, and Smart's conviction under that provision is affirmed.

D. *Departures From Sentencing Guidelines*

■ Finally, before sentencing, the defense counsel filed a sentencing memorandum asking the court to depart downward from the Sentencing Guidelines in light of the Sentencing Commission's Special Report to Congress on Cocaine and Federal Sentencing Policy ("Commission's Special Report"), addressing the sentencing disparity between powder cocaine and crack cocaine. At appellant's sentencing hearing on May 12, 1995, the defense counsel urged the court to depart from the Sentencing Guidelines, and attempted to persuade the court that it had the discretion and legal authority under 18 U.S.C. § 3553(b)[23] and pursuant to U.S.S.G. § 5K2.0, to depart downward from the guideline range based on the Commission's Special Report. The court, however, rejected the argument, stating, "suspicion [that the circuits will change their position if Congress should adopt the Commission's recommendations] is not good enough when we've got a flat statement of what the law is." Tr. V, at 5.

This court's decision in *United States v. Anderson*, 82 F.3d 436 (D.C.Cir.1996), is di-

rectly on point. In *Anderson*, this court held that "Congress's and the Commission's actions gave [the district judge] no power to depart [from the Sentencing Guidelines]." *Id.* at 442. This decision is dispositive, for the present at least, and the district court did not err in refusing to depart.

*Affirmed.*

---

legitimately found a "carrying" firearm offense vis-a-vis the parking lot evidence. If the drug offense found by the jury were confined to the tree drugs, then the firearm offense might not relate to a drug offense, as required by § 924(c)(1). Necessary to counsel's hypothetical scenario is the notion that, under the broad definition of "use" under § 924 offered to the jury, they could have found "use" of a firearm constructively (*e.g.*, based on its being in his car while he was near the trees), even though the gun was not found at the same time that the drugs were seen in the defendant's possession. The elaborate scenario proposed by defendant's counsel seems too farfetched a possibility for any

rational jury to base its verdict on in light of the evidence offered at trial.

**23.** Under this provision, a sentencing court may impose a sentence outside the range provided for by the sentencing guidelines if the court determines

that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b).