**UNITED STATES of America,
Appellee,**

v.

**John WILLIAMS, Appellant.**

No. 99–3058.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 18, 2000.

Decided May 30, 2000.

Gabriel R. Sanz–Rexach argued the cause for the appellant. John P. Dean was on brief for the appellant.

Sharon A. Sprague, Assistant United States Attorney, argued the cause for the appellee. Wilma A. Lewis, United States Attorney, and John R. Fisher, Assistant United States Attorney, were on brief for the appellee.

Before: SILBERMAN, HENDERSON and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

Dissenting opinion filed by Circuit Judge SILBERMAN.

KAREN LeCRAFT HENDERSON, Circuit Judge:

John Williams seeks reversal of his conviction of possession of a firearm and ammunition by a felon. Williams argues that the district court made erroneous evidentiary rulings that cannot be deemed harmless. He challenges the admission of police officers' testimony regarding the contents of a police radio call during the events leading to his arrest, the general danger of traffic stops and the assertion that drug users commonly carry weapons. It is the admission of the latter, followed by the trial court's denying Williams an opportunity to cross-examine the witness and the government's mention of the tes-

timony in closing argument, which concerns us here.[1]

## I.

Between 1:30 and 1:45 a.m. on August 1, 1998, Officers Antonio Duncan and David Reid of the Metropolitan Police Department, patrolling in the southeast region of the District of Columbia in a police cruiser, stopped the car in which Williams was a passenger for failing to stop completely at a stop sign and then straddling a double-yellow line. As soon as the officers left their cruiser, Williams got out of the passenger side of the car "in a crouched position." Transcript (Tr.) 3/3/99 at 39. The officers testified that Williams immediately reached for his waistband and that he was holding something "of some girth[,] . . . an object of some weight," *id.* at 166, which they believed could have been a concealed weapon. *See id.* at 158–59, 166–67. Ignoring commands to remain in the car and, then, to show his hands, Williams maneuvered around the open door and began running. Duncan chased him while Reid detained the driver, who had stayed in the car.[2]

Running with his hands at his waistband, Williams began to cross a footbridge. He collided into the metal railing and slowed down a bit. The collision caused a metal clanking noise. Duncan suspected that whatever object Williams appeared to have been carrying caused the clanking noise and that Williams may have discarded it from the bridge. Continuing his pursuit, Duncan did not hear the sound of an object striking the concrete "creekbed" below. He made a radio call requesting backup wherein he described the suspect and his location and mentioned the "possi-

bility" that the suspect had a gun.[3] Tr. 3/3/99 at 47. Shortly thereafter, Duncan apprehended and arrested Williams with the help of an unidentified civilian.

Officer Carter Adams responded to the radio call and, at Duncan's direction, searched portions of the creekbed. Williams had told Duncan, when returning to the spot where he hit the footbridge railing, first, that Duncan had not seen him throw anything and "had no case" and, then, that he had thrown his "stash" or his "works," *id.* at 50, terms commonly used to refer to drugs and drug paraphernalia, respectively. Adams found no drugs or drug paraphernalia but did find a handgun. The creekbed contained "no more than half an inch" of water. Tr. 3/4/99 at 5. Analysis of the gun revealed neither fingerprints nor rust. The safety switch on the side of the gun facing the ground was bent and a piece on the bottom of the gun was cracked.

Williams's first trial on one count of unlawful possession of a firearm and ammunition by a felon, a violation of 18 U.S.C. § 922(g)(1), resulted in a mistrial when the jury failed to reach a unanimous verdict. After Williams withdrew a guilty plea to a lesser offense, a second trial commenced. The officers' testimony at the retrial focused on their suspicion that Williams had a gun because of his movements when he got out of the car and his collision with the bridge railing. The officers conceded, however, that they did not see an object in Williams's hands nor see him actually throw anything. Defense counsel offered other explanations for the officers' observations and for the discovery of the gun in the creekbed. The government had established Williams was a drug

---

1. We have considered Williams's arguments regarding the admissibility of other portions of the officers' testimony and find them without merit.

2. The reasonableness of neither the stop of the car nor the subsequent pursuit of Williams is in question.

3. While Duncan testified that he had said *"possibility"* in the radio call, *see* Tr. 3/3/99 at 47, Officer Carter Adams, who responded to the call, testified that he remembered the radio call differently, that is, as describing the suspect as a man *with* a gun. *See* Tr. 3/3/99, mid-afternoon session, at 5. The tape of the call was not in evidence.

user[4] so·defense counsel raised the possibility that Williams could have discarded drugs or drug paraphernalia, *see* Tr. 3/3/99 at 109–11, and suggested that the officers did not conduct an adequate search to rule out the possibility, *see id.* at 140–42. Counsel also elicited testimony that violence was common in the area and recovery of a gun in the area was not unprecedented. *See id.* at 80.

After a lengthy redirect examination of Duncan, the prosecutor ended the questioning with the following exchange:

Q: Now you were·asked a lot of questions about violent·crimes in that area [where the chase and subsequent arrest occurred] and about guns being discarded, is that right?

A: Correct.

Q: Okay. And you know that area pretty well?

A: Yes.

●●●

Q: In your experience as a patrol officer, is it common for people who *use* *drugs* or sell drugs to carry weapons for protection? ·

A: Yes.

Tr. 3/3/99 at 160–61 (emphasis added). The court then excused Duncan from the witness ̈ stand and defense counsel approached the bench, explaining that she would have objected to the last question but did not have the chance because "[t]hat answer came out so quickly." *Id.* at 161. The trial judge said she would have allowed the exchange in any event and then denied counsel's request for a "very brief re-cross." *Id.* The prosecutor reminded the jury of Duncan's testimony during her reply closing argument and in the following context:

Counsel also raised an issue about violent crime in the area to explain, possibly, how this gun—some other way that this gun could have ended up in

that creek.... [C]ounsel ask [*sic*] a number of questions about violent crime and about people discarding weapons in the area[,] and you will recall those type [*sic*] of questions. Well, remember that the officer also testified that it is not uncommon for drug users or drug sellers to carry weapons for protection as well.

Ladies and gentlemen, there is no evidence that this weapon was tied to any violent crime. And in fact, the evidence is to the contrary because had this gun been involved in a violent crime, where somebody wanted to get rid of it, you would expect that it wouldn't be fully loaded.... If you recall, this was a fully loaded weapon with one in the chamber.... In addition, it's an expensive weapon....

Tr. 3/4/99 at 154–55.

Williams was convicted and sentenced to 180 months in prison, followed by two years of supervised release. A special assessment of $100 was also imposed.

## II.

 We review a trial judge's evidentiary rulings for abuse of discretion. *See* *United States v. Smart,* 98 F.3d 1379, 1386 (D.C.Cir.1996) (citing *United States v. Salamanca,* 990 F.2d 629, 637 (D.C.Cir.), *cert. denied,* 510 U.S. 928, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993)). A "district court's decision to admit evidence ... is entitled to 'much deference' on review," *United States v. Ramsey,* 165 F.3d 980, ·984 n. 3 (D.C.Cir.) (quoting *United States v. Lewis,* 693 F.2d 189, 193 (D.C.Cir.1982)), *cert. denied,* —— U.S. ——, 120 S.Ct. 223, 145 L.Ed.2d 187 (1999), but if it is found erroneous, the burden is on the government to prove the error was harmless. *See United States v. Lampkin,* 159 F.3d 607, 614 (D.C.Cir.1998), *cert. denied,* 526 U.S. 1140, 119 S.Ct. 1798, 143 L.Ed.2d

---

4. *See* Tr. 3/3/99 at 68–69 (property taken from Williams after arrest included syringe and needle exchange card).

1024 (1999); *Smart*, 98 F.3d at 1390 ("At all times, the burden of proving that an error was not prejudicial rests on the government.") (citing *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

## A.

Williams challenges the admission of Duncan's affirmative reply on redirect examination to the following question: "In your experience as a patrol officer, is it common for people who use drugs or sell drugs to carry weapons for protection?" Tr. 3/3/99 at 160–61. Although the inquiry regarding Duncan's experience with drug dealers commonly carrying weapons for protection raises no eyebrows, *see, e.g.*, *United States v. Conyers*, 118 F.3d 755, 757 (D.C.Cir.1997) (noting in appeal of drug trafficking conviction "those who transport drugs often carry (and all too often use) a firearm"), we cannot say the same regarding drug users.[5] Finding the link between drug users and guns tenuous, we look to the foundation of Duncan's opinion testimony.

■ The prosecutor framed the question to Duncan as "in [his] experience as a patrol officer." Duncan had testified earlier that he had made gun charge arrests about "six or seven·times." Tr. 3/3/99 at 148. He added that he had "recovered more than one weapon on a person" and then revised his previous estimate to "anywhere from ten to eleven, just a general amount." *Id.* After hearing defense counsel's late objection to Duncan's response and commenting that she would have overruled the objection had it been timely made, the trial judge denied defense counsel the opportunity to recross-examine Duncan.

■ The foundation of Duncan's opinion linking drug users and possession of weapons is anything but firm. Fewer than one dozen arrests involving possession of a firearm is not sufficient grounding to qualify him as an expert under Rule 702 of the Federal Rules of Evidence (FRE), particularly without evidence establishing that any of those arrests involved a drug *user*. If, instead, we view his testimony as having been admitted under Rule 701,[6] FRE, we question whether Duncan's answer was

---

**5.** As noted, evidence at trial established that Williams was a drug user. *See, e.g.*, Tr. 3/3/99 at 50, 68–69.

**6.** Rule 701, FRE, allows lay opinion testimony that "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." FED. R.EVID. 701. We afford trial judges broad discretion in admitting opinion testimony of lay witnesses. *See, e.g.*, *United States v. Pierson*, 503 F.2d 173, 176 (D.C.Cir.1974) (trial judge should have broad discretion and "[o]nly a clear abuse of discretion" warrants reversal); *see also United States v. Pierce*, 136 F.3d 770, 773 (11th Cir.) (" 'The ultimate decision as to the admissibility of lay opinion testimony is committed to the sound discretion of the district court and will not be overturned on appeal unless there is a clear abuse of discretion.' ") (quoting *United States v. Myers*, 972 F.2d 1566, 1576–77 (11th Cir. 1992)), *cert. denied*, 525 U.S. 974, 119 S.Ct. 430, 142 L.Ed.2d 350 (1998). The leeway is due in large part to the opportunity the trial

judge ordinarily affords opposing counsel to expose a weak foundation through cross-examination of the witness. *See, e.g.*, *Pierson*, 503 F.2d at 176 (" 'It is hardly ever reversible error to admit such evidence; its foundation may generally be as conveniently left to cross-examination.' ") (quoting *Central R.R. Co. of N. J. v. Monahan*, 11 F.2d 212, 214 (2d Cir. 1926) (Hand, J.)); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Nevertheless, to admit lay opinion evidence rationally based on the witness's perception, a sufficient factual foundation must exist. *See, e.g.*, *Carter v. United States*, 252 F.2d 608, 617 (D.C.Cir.1957) (lay witnesses may testify "only upon the basis of facts known to them").

The Office of Legal Education of the Executive Office for United States Attorneys provides guidelines to establish a proper foundation for the opinion testimony of a skilled lay observer:

rationally based on his perceptions. He did not establish a factual basis for credible opinion testimony regarding the likelihood of drug users being armed.[7] Moreover, as noted above, trial judges generally rely on the structural check of cross-examination in permitting opinion testimony with a weak foundation and, for that reason, enjoy broad discretion. But here the trial court refused to grant defense counsel's request for an opportunity to recross-examine Duncan which would have allowed counsel to expose Duncan's lack of experience. We conclude that the district court's ruling admitting arguably relevant testimony[8] over objection despite the lack of foundation, especially in light of its subsequent denial of defense counsel's request for "a very brief re-cross," constitutes error. *Cf. United States v. Stock*, 948 F.2d 1299, 1302 (D.C.Cir.1991) (error to deny cross-examination of police officer for impeachment). We now consider if the error was harmless.

### B.

 In determining whether a non-constitutional trial error is harmless, we ask

> 1. That the witness has, on prior occasions sufficient in number to support a reasonable inference of knowledge of or familiarity with a subject, observed particular events, conditions, or other matters.
> 2. That the witness on a certain occasion observed a specific event, condition, or matter of the same nature as previously observed.
> 3. That on the basis of his knowledge or familiarity with the event, condition or matter, he has an opinion as to the event, condition or matter involved in the case.
> 4. That the statement of the opinion will be helpful to a clear understanding of the testimony of the witness [or] the determination of a fact in issue.

J. Randolph Maney, Jr. & Ruth E. Lucas, Courtroom Evidence 130 (Office of Legal Education, Executive Office for United States Attorneys (1998) (citing Murl A. Larkin, Federal Evidence Foundations 119–20 (1988))). Here the prosecutor established neither the first nor the second premise above. She elicited no testimony from Duncan regarding any "prior occasions," much less occasions "sufficient in number to support a reasonable inference of knowledge," in which he arrested

whether " 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' " *United States v. Schaffer*, 183 F.3d 833, 852 (D.C.Cir.1999) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). In other words, we ask "whether the error 'had a substantial or injurious effect or influence in determining the jury's verdict.' " *Smart*, 98 F.3d at 1390 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239)). If the error had such an effect, or if we are left in " 'grave doubt' " about the harmlessness of the error,[9] we must reverse the conviction. *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

 On the record below, we can identify only one factor (apart from the testimony itself) suggesting the testimony may have affected the jury verdict, that is, the prosecutor's reminding the jury of Dun-

---

drug users carrying guns or otherwise observed drug users carrying guns.

7. The lack of foundation for this testimony is especially clear when compared to the government's practice of eliciting *expert* testimony to establish drug *dealers'* habits. *See, e.g., United States v. Fennell*, 53 F.3d 1296, 1300 (D.C.Cir.1995), *order on reh'g*, 77 F.3d 510 (1996).

8. Assuming a proper foundation, the testimony would tend to make less probable the scenario defense counsel had suggested, that is, area violence accounted for the gun found in the creekbed.

9. The United States Supreme Court has said: "By 'grave doubt' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Explaining further, the Court described "grave doubt" as "unusual" because "[n]ormally a record review will permit a judge to make up his or her mind about the matter ... [a]nd indeed a judge has an obligation to do so." *Id.*

can's testimony during her closing argument in rebuttal. *See United States v. Rhodes*, 886 F.2d 375, 382 (D.C.Cir.1989) (prosecutor's closing argument reference to improperly admitted evidence contributed to conclusion that error was not harmless). Because the testimony was elicited during redirect examination and recross-examination was denied, defense counsel could have responded to the testimony only in her closing argument and could not have responded at all to the prosecutor's rebuttal reference to Duncan's testimony. Although defense counsel did not, perhaps understandably, request a limiting instruction regarding Duncan's challenged testimony, she did obtain a limiting instruction as to other portions of Duncan's testimony. *See* Tr. 3/1/99 4–5, 8–9 and Tr. 3/4/99 at 105 (instruction limiting use of testimony regarding radio call). The absence of an instruction limiting the jury's use of the challenged testimony may have reinforced it. *Cf. United States v. Spinner*, 152 F.3d 950, 961–62 (D.C.Cir.1998) (limiting instruction given for some but not other "bad acts" evidence may enhance latter's influence on jury). Notwithstanding the prosecutor's statement reminding the jury of Duncan's testimony linking drug users and guns, we believe the statement, viewed in the context of the entire rebuttal closing argument (only one sentence in an argument covering ten pages in the record, *see* Tr. 3/4/99 at 150–59) had minor impact. The prosecutor made the comment in response to the defense explanation for discovery of the gun. The thrust of her response, however, was the lack of evidence to support Williams's theory that guns are endemic to a high crime area.

The most significant factor that negates the error's impact is the weight and nature of the evidence against Williams.[10] *See generally Stock*, 948 F.2d at 1304 (refusal to allow cross-examination of officer violated confrontation clause but was harmless because other prosecution evidence "was so much more credible than the defense testimony that [the court concluded] without reasonable doubt that the jury would have found [defendant] guilty"). The government's case was based on Duncan's and Reid's observations of Williams as he got out of the car and as he fled. The officers testified that Williams first disregarded Duncan's order to remain in the car. When Williams got out, he was "in a crouched position," Tr. 3/3/99 at 39, and "immediately grabbed for his waistband," *id.* at 166. He "was holding something of some girth," *id.*, and refused to obey Duncan's command to show his hands, *see id.* at 167, instead running away with his hands still at his waistband. *See id.* at 44. Recounting his pursuit, Duncan said that Williams's bumping into the metal railing of the footbridge caused a clanking noise as Williams slowed down and appeared to discard something. *See, e.g., id.* at 45–48. When Duncan finally apprehended him, Williams first stated "that [Duncan] didn't see him throw anything, and that [Duncan] had no case," and then claimed he had thrown his drug "works" from the bridge. *Id.* at 50.

As a passenger in a car stopped by the police, Williams's immediate flight does not weigh in his favor.[11] *See Illinois v. Wardlow*, —— U.S. ——, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000) (defendant's unprovoked flight from officers in area of heavy narcotics trafficking supported reasonable

---

10. Our dissenting colleague speculates that because the first trial resulted in a hung jury, the second trial necessarily presented a close case. *See* Dis. Op. at 1312–13. We advise caution in assigning critical significance to the failure of a different jury, which heard different evidence and argument, to reach agreement. We should also hesitate to connect the length of deliberations with the strength of the government's case. *But cf. id.*

(relying on *Dallago v. United States*, 427 F.2d 546 (D.C.Cir.1969) (five-day deliberation after six-week trial with 37 witnesses and 175 exhibits)).

11. The trial judge instructed the jury that evidence of flight may be properly considered as a circumstance suggesting guilt but that it does not raise a presumption of guilt. *See* Tr. 3/4/99 at 104.

suspicion defendant was involved in criminal activity). More significant was the ready discovery of a handgun (without rust and slightly damaged—both factors consistent with having recently fallen from the bridge above) where Duncan suspected it would be found and the fact that Williams did not deny that he threw something from the bridge or that the police found the gun below the bridge. Rather, Williams offered an alternative explanation for what he threw, which was not found, and for why it was not found. The properly admitted evidence leaves little doubt that the erroneous admission of the testimony linking drug users and guns was harmless. *See United States v. Sanchez–Sotelo*, 8 F.3d 202, 211 (5th Cir.1993) (error in admitting lay opinion testimony without foundation harmless where evidence *aliunde* permitted inference establishing element of crime); *cf. United States v. Rhodes*, 62 F.3d 1449, 1453 (D.C.Cir.1995) (error in admitting without foundation prior inconsistent statement of witness admitting he and defendant had been selling drugs and firearms not sufficiently prejudicial to warrant reversal where prosecution established drugs and weapons seized belonged to defendant); *United States v. McConnell*, 988 F.2d 530 (5th Cir.1993) (admission of coconspirator statement without foundation constituted reversible error in conspiracy conviction where hearsay testimony was "*crucial link* in the chain" between appellants and conspiracy) (emphasis added).

Moreover, although, as noted earlier, defense counsel requested no limiting instruction, the trial judge gave standard instructions that the jury is the "sole judge" of the credibility of the witnesses, Tr. 4/4/99 at 102, a determination that may be affected by whether a witness had an opportunity to observe matters about which he testified, *see id.*, and that the questions, statements and arguments of the lawyers are not evidence. *See id.* at 100, 101. We believe these instructions further mitigated any potential prejudice. *See United States v. Hawkins*, 595 F.2d 751, 755 (D.C.Cir.1978) (similar instructions "provided at least some mitigation of any prejudice ... which might have arisen from the prosecutor's closing remarks"); *Barkley v. United States*, 323 F.2d 804, 808 (D.C.Cir.1963) (no plain error for failure to give cautionary instruction on lay testimony in absence of request and where general credibility instruction given). *But cf. United States v. Watson*, 171 F.3d 695, 700–02 (D.C.Cir.1999) (standard jury instructions notwithstanding, prosecutor's misstatement of evidence in closing regarding central issue in close case not harmless error).

In addition, Duncan's testimony elicited by the prosecution was only partially objectionable. The reference to drug users did not stand alone; rather, the prosecution referred to drug users and drug dealers. The fact that the jury heard unobjectionable testimony together with objectionable testimony may have "buried," and therefore minimized, the objectionable portion.

For the foregoing reasons, we conclude that the brief testimony and argument linking drug users and guns did not have a "substantial effect" on the verdict nor are we left in "grave doubt" regarding the harmlessness of the error. Reviewing the evidence against Williams, we are confident the jury focused on Duncan's and Reid's observations of Williams during the stop and pursuit and on other inculpatory evidence, including the location and condition of the gun retrieved, not on Duncan's affirmative response to a general proposition made at the very end of his lengthy testimony. Accordingly, we find the error harmless and affirm Williams's conviction.

*So ordered.*

SILBERMAN, Circuit Judge, dissenting:

I agree with the majority that the trial judge committed error in this case, but I disagree that the error was harmless.

This was a close case. Although the officers testified that appellant was acting

as if he had a gun, no one saw appellant with one, and there were no fingerprints on the gun. *See* Maj. Op. at 1307. Appellant's flight is neither here nor there with respect to whether he possessed a firearm; flight is equally indicative of appellant's possession of the illegal drugs he claimed to have. *See* Maj. Op. at 1311–12. There is a vast difference between using flight as the basis for a reasonable suspicion of some unknown criminal activity, *see Illinois v. Wardlow*, —— U.S. ——, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000), and using flight here to link appellant to a gun found in his vicinity. While some evidence was at least suggestive of appellant's guilt (his behavior, the condition of the gun), it was hardly overwhelming. I find it difficult to believe a jury found appellant guilty beyond a reasonable doubt.

The majority considers the possibility that the jury did not pay attention to Officer Duncan's statement with respect to drug *users* and guns, hypothesizing that the officer's statement with respect to drug *dealers* overshadowed it. *See* Maj. Op. at 1312. But I find that unlikely. If, as we all agree, a statement that "drug dealers commonly carry weapons for protection raises no eyebrows," Maj. Op. at 1309, it is probable the jury focused on the new information that the same is true of drug users. Since appellant was an admitted drug user—he argued as much to the jury—the likelihood that the jury glossed over Officer Duncan's statement is minuscule. And the prejudicial statement cuts right to the heart of the case: Was this drug user in possession of a gun?

It is particularly troubling that, as the court's opinion recounts, the first jury to consider this case could not reach a decision, resulting in a mistrial. *See* Maj. Op. at 1307–08.[1] It was only in the second trial, in which Officer Duncan's prejudicial statement about drug users and weapons was introduced, a statement repeated by the prosecutor during her summation, that

appellant was convicted. Since the inquiry we undertake asks whether "with fair assurance, after pondering all that happened without stripping away the erroneous action from the whole, ... the [jury's] judgment was not substantially swayed by the error," the original mistrial is undoubtedly relevant. *United States v. Schaffer,* 183 F.3d 833, 852 (D.C.Cir.1999). The difficulty the first jury had with this case amply demonstrates that we are not considering "an error [that] may be more freely disregarded [because] the evidence of defendant's guilt was overwhelming, since in such a case the outcome would almost surely have been the same despite the error." Charles A. Wright, 3A FED. PRAC. & PROC.CRIM.2d § 854 (1982). If we are willing to take into consideration the length of jury deliberations in our harmless error review, *see Dallago v. United States,* 427 F.2d 546, 559 (D.C.Cir.1969) ("The jury deliberated for five days, and one would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner."), surely we must consider the import of the hung jury.

Under these circumstances, I would remand for a new trial.

---

1. The majority does not contend–nor could it– that the first trial's hung jury is irrelevant. *See* Maj. Op. at 1311 n.10. Combined ·with the weakness of the government's case it should trouble the majority as much as it does me.