# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 20, 2023       Decided August 1, 2023

No. 21-3075

UNITED STATES OF AMERICA,
APPELLEE

v.

ELEANOR R. MILLIGAN,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cr-00424-1)

*George W. Hicks Jr.*, appointed by the court, argued the cause and filed the briefs for appellant.

*Bryan H. Han*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Diane G. Lucas*, Assistant U.S. Attorneys.

Before: SRINIVASAN, *Chief Judge*, MILLETT, *Circuit Judge*, and TATEL, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

2

Opinion concurring in part, dissenting in part, and dissenting from the judgment filed by *Circuit Judge* MILLETT.

SRINIVASAN, *Chief Judge*: Eleanor Milligan was convicted of wire fraud and other offenses for embezzling over one million dollars from her former employer, Global Management Systems, Inc. In this appeal, Milligan seeks to set aside both her convictions and her sentence.

With respect to her convictions, Milligan contends that the district court erred in admitting evidence of her embezzling from a different employer to prove her intent and lack of mistake concerning the offenses charged in this case. With respect to her sentence, Milligan challenges the district court's application of a sentencing enhancement for her use of sophisticated means to conceal her scheme, and she submits that her eight-year sentence of imprisonment is unreasonable. We reject Milligan's arguments and affirm her convictions and sentence.

I.

A.

From 2009 to 2016, Milligan worked as a payroll specialist and then as the human resources benefits administrator for Global Management Systems, Inc. (GMSI), a firm that provides technological services such as web development and telecommunications to federal government agencies. Milligan was responsible for maintaining and submitting payroll information to a third-party company that paid GMSI employees their salary. The third-party company directly deposited paychecks into employees' bank accounts or mailed them physical checks.

During her employment, Milligan implemented a scheme whereby she accessed GMSI's payroll system and altered the information of employees who had recently left the company. Rather than removing the former employees' information from the system and shutting off their pay when they departed, as she was supposed to do, Milligan left their information in the system as if they remained on the payroll. GMSI's third-party vendor thus continued to issue paychecks to the departed employees. But Milligan altered the former employees' bank account information so that their continued paychecks would be deposited into an account she owned.

Milligan took several steps to conceal her embezzlement. In 2011, the Internal Revenue Service contacted a former GMSI employee, David Morgan, and informed him that he had failed to submit a W-2 for wages he earned from the company that year. Morgan in fact had stopped working for GMSI by 2010, but Milligan retained his information in the payroll system and redirected his continuing paychecks into the bank account she controlled. After the IRS reached out to Morgan, he contacted Milligan to inquire about why the IRS believed he was still getting paid by GMSI. Milligan responded by sending Morgan a corrected W-2 that showed he had not worked for GMSI in 2011. The IRS contacted Morgan again in 2012 for the same issue, prompting Morgan again to contact Milligan, which led Milligan to send him another corrected W-2 for 2012.

Milligan's efforts to conceal her scheme did not stop there. When her supervisor discovered that GMSI continued to pay Morgan after he had left the company, Milligan told her supervisor that she made a mistake and forgot to stop the paychecks from issuing. Milligan later showed her supervisor a message she received from the email address "DavidMorgan647@Ymail.com." The message, ostensibly

from Morgan, stated that Milligan had brought the erroneous payments to Morgan's attention and that he agreed to pay the money back to GMSI. The "DavidMorgan647" account subsequently exchanged a series of emails with Milligan and Milligan's supervisor to discuss the logistics of repayment. In reality, all of the messages from "DavidMorgan647," as well as the account itself, had been created by Milligan without Morgan's knowledge.

Milligan later delivered checks, which she claimed she had received from Morgan as repayment, to her supervisor. Those checks bore the address of a supposed entity entitled "David Morgan Rental Properties." But those checks, like the email messages from "DavidMorgan647," came from Milligan without Morgan's knowledge. What is more, the business "David Morgan Rental Properties" existed in name only—Milligan had obtained a mailbox from a UPS store in that name.

Milligan ultimately obtained over $1.5 million from her embezzlement scheme before GMSI fired her in 2016 for unrelated performance issues.

## B.

In December 2019, the government brought a thirteen-count indictment against Milligan for her embezzlement scheme, including eight counts of wire fraud. At trial, over Milligan's objection, the district court allowed the government to introduce evidence of her alleged commission of a similar scheme with a second employer as probative of her intent and lack of mistake. The second employer was the payroll office of the University of Maryland Medical System (UMMS), where Milligan worked after GMSI fired her. While at UMMS, Milligan allegedly altered the payroll information of several employees to cause their payouts for sick leave or vacation

leave to be deposited into an account she controlled. The district court later gave the jury a lengthy limiting instruction directing the jury to consider the UMMS evidence only as potentially probative of intent and lack of mistake, not as reflective of Milligan's character.

The jury convicted Milligan on all counts. At sentencing, the district court imposed a sentence of 96 months of imprisonment. For the eight counts of wire fraud, the court applied a two-level sentencing enhancement for her use of "sophisticated means" to conceal her offenses. U.S.S.G. § 2B1.1(b)(10)(C). The enhancement increased the Sentencing Guidelines range for the wire fraud counts from 57 to 71 months to 70 to 87 months, and the district court sentenced Milligan to 72 months on those counts.

## II.

### A.

Milligan first challenges her convictions, contending that the district court erroneously admitted the UMMS evidence in violation of Federal Rule of Evidence 404(b). We do not decide whether the admission of that evidence contravened Rule 404(b). Even assuming the district court erred in admitting that evidence, any error was harmless.

The Federal Rules of Criminal Procedure require us to "disregard[]" any "error, defect, irregularity, or variance that does not affect substantial rights." Fed. R. Crim. P. 52(a). For nonconstitutional errors like the one Milligan asserts here, "an error is harmless" and thus does not compel reversal "if it did not have a 'substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Powell*, 334 F.3d 42, 45 (D.C. Cir. 2003) (quoting *Kotteakos v. United*

*States*, 328 U.S. 750, 776 (1946)).  Milligan asserts that the UMMS evidence had an injurious effect because the evidence was admitted to prove intent and lack of mistake, which she did not contest at trial.  As a result, she contends, the jury could have drawn an inference prohibited by Rule 404(b):  that she stole money from UMMS so she likely also stole money from GMSI.  That risk of unfair prejudice was particularly pronounced, Milligan maintains, due to the similar nature of the UMMS and GMSI allegations.

True, "[t]he introduction of other crimes evidence to illuminate intent carries an inherent risk of such prejudice." *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995).  But in this case, "the district court took caution to guard the space between the permissible and impermissible inferences by instructing the jury to consider the [UMMS] evidence only for its proper purpose" under Rule 404(b)—as probative of Milligan's intent.  *See id.*  The district court issued a lengthy and thorough limiting instruction, the substance of which Milligan does not challenge.  And our court has recognized that a limiting instruction of that kind can help to cabin the potential prejudicial impact of any erroneous admission of evidence for purposes of harmless-error analysis.  *See United States v. Sheffield*, 832 F.3d 296, 308–09 (D.C. Cir. 2016); *United States v. Brown*, 597 F.3d 399, 405–06 (D.C. Cir. 2010).

When applying harmless-error analysis, moreover, "[t]he most significant factor that negates [an] error's impact is the weight and nature of the evidence against [the defendant]." *United States v. McGill*, 815 F.3d 846, 886 (D.C. Cir. 2016) (last alteration in original) (quotation marks omitted) (quoting *United States v. Williams*, 212 F.3d 1305, 1311 (D.C. Cir. 2000)).  Here, the UMMS evidence was a small piece of what was otherwise an overwhelming case against Milligan.  The case against her included extensive testimonial and

documentary evidence that: she was the only person who accessed the payroll system in which direct deposits could be rerouted; payments made in the names of various former employees were deposited into a bank account controlled by her; and she took several steps to impersonate a former employee to conceal that she was the recipient of payments intended to go to him. The UMMS evidence, additionally, was mentioned only once by the government in closing arguments. And it is not at all apparent—and Milligan has not identified—how the UMMS evidence could have borne on the finding of guilt given her defense strategy, which was confined to disputing whether the interstate commerce element of her offense was met. Nor has she suggested that the admission of the UMMS evidence affected her choice of that strategy in the first place.

In short, in light of the detailed limiting instruction the district court gave the jury about the purpose of the UMMS evidence, the strength of the government's case against Milligan apart from that evidence, and the relatively small role that evidence played at trial, we conclude that any error in admitting the UMMS evidence was harmless.

## B.

We now turn to Milligan's challenge to the district court's application of the sophisticated-means sentencing enhancement. The Sentencing Guidelines provide for a two-level sentencing enhancement when an offense "involve[s] sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). The commentary to the Guidelines explains that "'sophisticated means' means especially complex or especially intricate offense conduct

pertaining to the execution or concealment of an offense." *Id.* § 2B1.1 cmt. n.9 (emphasis omitted).

The commentary also offers examples of conduct constituting sophisticated means. For instance, "[c]onducting an offense in multiple jurisdictions 'ordinarily indicates sophisticated means.' So too does the use of 'fictitious entities, corporate shells, or offshore financial accounts' to conceal the fruits of an unlawful scheme." *United States v. McCants*, 554 F.3d 155, 163 (D.C. Cir. 2009) (internal citations omitted) (quoting U.S.S.G. § 2B1.1 cmt. n.9). That said, several of our sister circuits agree that the enhancement can apply "to conduct less sophisticated than the list articulated in the application note." *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013) (collecting cases). After all, "the examples are by their own terms simply illustrative, not exclusive." *United States v. Lewis*, 93 F.3d 1075, 1082 (2d Cir. 1996).

Because "[t]he district court's conclusion that [Milligan's] offense warrants a sophisticated means enhancement is an application of the Sentencing Guidelines to the facts," we "accord due deference" to that conclusion. *McCants*, 554 F.3d at 163; *United States v. Hunt*, 25 F.3d 1092, 1097 (D.C. Cir. 1994). In the district court's view, the "evidence at trial sp[oke] for itself" as to the applicability of the sophisticated-means enhancement. Sentencing Hr'g Tr. 13, J.A. 241. But the court "note[d] in particular" several of what it considered to be "sophisticated, concrete steps that [Milligan] took to conceal what she had done." *Id.* Those steps included Milligan's setting up an email account in Morgan's name, sending communications from that account that purported to be from Morgan, and establishing a mailbox in the name of "David Morgan Rental Properties." *Id.*

9

Giving the district court the requisite "due deference"—which falls "somewhere between *de novo* and clearly erroneous," *McCants*, 554 F.3d at 160 (internal quotation marks omitted)—we sustain the court's application of the sophisticated-means enhancement. The evidence from Milligan's trial shows that she engaged in a sufficiently sophisticated scheme to hide her embezzlement of funds from GMSI. Once Morgan approached her about the IRS's concern that he had failed to report income ostensibly paid to him even after his employment with GMSI had ended, Milligan sought to deceive GMSI into thinking that Morgan had continued to receive paychecks after he left the company. To carry out that scheme, Milligan took several actions to impersonate Morgan. Beyond creating an email account in Morgan's name, authoring and sending communications from that account, and setting up a mailbox for a made-up company bearing Morgan's name, Milligan also returned some of her embezzled funds to GMSI with checks ostensibly authored by Morgan. Those checks in fact were linked to her own account but bore the address of the mailbox that she had obtained for the fictitious entity "David Morgan Rental Properties."

Milligan's actions in impersonation of Morgan lie in the same zone of sophistication as the conduct deemed to qualify as sophisticated means in *McCants*. There, McCants was convicted of possessing implements used to make false identifications and other counterfeit documents, and the district court applied the sophisticated-means enhancement based on his efforts to conceal his offense. He committed his offense in multiple jurisdictions, he kept some of his false documents and document-making devices in storage units rented under an alias, and he used an allegedly legitimate business to hide his possession of those implements. *McCants*, 554 F.3d at 163. Over McCants's objection that those efforts lacked sufficient sophistication, we affirmed his sentence. Although we could

"imagine scenarios involving more elaborate means to avoid detection or conviction," that did "not render the district court's resolution of the question invalid." *Id.*

The same is true here. Milligan insists that a sophisticated-means enhancement was inappropriate because the "most unsophisticated offender" could set up an email address or obtain a mailbox. Milligan Br. 19–20. But we do not assess the sophistication of a defendant's concealment actions piecemeal. Renting storage units under an alias, for instance, may not seem especially complex considered in isolation. *McCants*, 554 F.3d at 163. But that conduct, considered in the broader context at play in *McCants*, supported application of the sophisticated-means enhancement. *See id.*; *cf. United States v. Evano*, 553 F.3d 109, 113 (1st Cir. 2009) ("[A] scheme may be sophisticated even if the individual elements taken alone are not.").

Here, Milligan did not just set up an email address or a mailbox. Rather, she took those actions as part of an overall scheme to impersonate Morgan so as to enable concealing her offense from GMSI: she set up an email address in Morgan's name and used that account to author and send several emails to GMSI that purported to be from Morgan, and she obtained a mailbox in the name of a fictitious entity bearing Morgan's name so that she could then obtain checks listing that address for her use in writing checks that appeared to come from Morgan's business. We observed in *McCants* that the "use of 'fictitious entities' . . . to conceal the fruits of an unlawful scheme" generally counts as sophisticated means, *McCants*, 554 F.3d at 163 (quoting U.S.S.G. § 2B1.1 cmt. n.9), and Milligan did precisely that in this case.

Our affirmance of the sophisticated-means enhancement also coheres with its central object: deterrence. As the Seventh

Circuit has explained, "[t]he more sophisticated the efforts that an offender employs to conceal his offense, the less likely he is to be detected, and so he should be given a heavier sentence to maintain the same expected punishment, and hence the same deterrence, that confronts the average offender." *United States v. Kontny*, 238 F.3d 815, 820 (7th Cir. 2001). For purposes of the enhancement, then, sophistication "refer[s] not to the elegance, the 'class,' [or] the 'style' of the defrauder . . . but to the presence of efforts at concealment that go beyond . . . the concealment inherent in [] fraud." *Id.* at 821.

Considered in that light, Milligan's impersonation of Morgan reduced the chances that GMSI would learn of her embezzlement, which in turn necessarily lessened the likelihood that her scheme would be detected by law enforcement (because GMSI presumably would have reported her conduct to the relevant authorities). And unlike lies or omissions inherently bound up in her embezzlement, Milligan's various measures to impersonate Morgan were not inherent to her underlying offense. Rather, those efforts, as they must to warrant the sentencing enhancement in the context of this case, went well beyond her simply denying any wrongdoing to GMSI or providing a false reason for why salary payments continued to issue to departed employees. Accordingly, the district court, in addressing deterrence considerations when imposing Milligan's sentence, emphasized "the lengths she went to conceal" her offense—which, to the court, amounted to "far more than . . . a simple lie to cover [her] tracks." Sentencing Tr. 11–12, 41, S.A. 227–28, 242. We thus uphold the district court's application of the sophisticated-means enhancement upon giving that decision the due deference it is owed.

Our dissenting colleague, though, would reject the district court's judgment that Milligan's concealment efforts warrant

application of the enhancement. Our colleague characterizes Milligan's measures to hide her fraud as an "ad hoc and one-off" reaction to avoid detection rather than "a pre-planned aspect of the fraud offense itself." Dissenting Op. 7. The enhancement, though, applies to "conduct pertaining to the execution *or* concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B) (emphasis added). And there is no indication that "concealment" of fraud matters less than the design of its "execution," or that "concealment" measures taken in reaction to risks of exposure that emerge after the fraud begins matter less than "concealment" measures of like sophistication taken proactively at the scheme's outset.

Even if Milligan's efforts to impersonate Morgan were a "one-off"—i.e., an "effort[] to cover up one instance of fraud in a decade-long scheme," Dissenting Op. 8—exposing that "one instance" would almost surely (and quickly) have prompted discovery of the entire "decade-long scheme." From the perspective of the fraudster whose conduct is at issue, then, concealing that one instance *was* concealing the full scheme. And at any rate, if a defendant takes actions to conceal a given instance of fraud, the applicability of the sentencing enhancement does not turn on whether she engaged in other instances of fraud too. Either way, the sophistication of the actions taken to conceal the one instance of fraud is the same, and the fact that the defendant may have also committed more fraud does not make application of the enhancement against her less appropriate. The Guideline's applicability depends on the sophistication of the execution and concealment of the offense, not on whether the concealment actions were taken to conceal all or only some of the offense conduct.

With respect to the sophistication of the concealment actions taken, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells,

or offshore financial accounts . . . ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 cmt. n.9(B). Our colleague does not dispute that Milligan, among other concealment measures, used a fictitious entity to hide her transactions. But our colleague says that Milligan's actions—registering a UPS mailbox in the name of that entity to enable "opening a checking account" in the entity's name and writing checks ostensibly issued by it—are "not the same as . . . creating and registering a corporate or other formal business entity, and then using that entity to conduct the fraud or launder profits." Dissenting Op. 8. True, but our sister circuits have found the use of fictitious entities in ways akin to Milligan's actions to count as sophisticated means, without requiring the creation and registration of a formal business entity. *See United States v. Allan*, 513 F.3d 712, 715–16 (7th Cir. 2008) (upholding sophisticated-means enhancement because defendant enrolled in a company's referral program in the names of nonexistent, fictitious entities and faxed falsified forms listing the entities as referral partners); *Lewis*, 93 F.3d at 1077, 1082 (applying sophisticated-means enhancement in part because defendant wrote checks to nonexistent, fictitious entities for deposit into accounts opened in the entities' names).

The district court's application of the sophisticated-means enhancement is also in keeping with our decision in *McCants*. In contending otherwise, our dissenting colleague envisions that case to have involved circumstances quite different from what our opinion in the case described. McCants's offense was unlawful possession of implements for making fake IDs. *See McCants*, 554 F.3d at 163. Our colleague says that McCants, unlike Milligan, "used specialized knowledge (in setting up a multistate fraudulent operation)." Dissenting Op. 9. But there is no indication in our opinion that McCants used any kind of specialized knowledge to set up (or carry out) his possession of fake ID implements at the two office sites of his business. And

although the two sites sat in different jurisdictions—D.C. and Maryland, *see* 554 F.3d at 158—there is no reason to infer that McCants possessed the implements in both locations as part of some orchestrated, specialized scheme to avoid detection. If anything, the more places a person possesses fake ID materials, the more likely the unlawful possession would be discovered.

Our colleague further observes that McCants "exploited the corporate form of a legitimate business entity to effectuate his scheme." Dissenting Op. 9. Again, though, our opinion in *McCants* contains no hint of any such exploitation. And it is far from clear how one would exploit an entity's corporate form to facilitate or conceal the *possession* of fake ID implements at the entity's premises. McCants's offense was not tax evasion or some such crime as to which a business's corporate form might be used to launder funds or otherwise hide the offense. Rather, McCants kept his fake ID equipment and paraphernalia at his business sites (and in storage units). *See McCants*, 554 F.3d at 158. Milligan similarly conducted her fraud at the business where she worked.

In the end, there is little reason to suppose that McCants employed appreciably greater specialized expertise in the concealment arts than did Milligan. Indeed, among the materials found in McCants's offices was "a pamphlet titled 'How to make driver's licenses and other ID's on your home computer.'" *Id.* While possessing a rudimentary how-to guide of that sort might not mark him as a criminal mastermind, McCants still used sufficiently elaborate means to conceal his offense to prompt the district court in his case to impose the sentencing enhancement. We "accord[ed] due deference to the court's conclusion" and sustained it. *Id.* at 163. We did not assess whether we would have reached the same decision in the first instance but instead asked whether "the district court's

resolution of the question [was] invalid." *Id.* Applying the same approach here, we reach the same conclusion.

## C.

Milligan lastly argues that her eight-year sentence is substantively unreasonable. Section 3553(a) requires the district court to consider the "history and characteristics" of the defendant before imposing a sentence. 18 U.S.C. § 3553(a)(1). Relying on that provision, Milligan asserts that the district court failed to adequately consider her age of 61 years at the time of sentencing and certain hardships she has experienced.

The record from Milligan's sentencing demonstrates otherwise. The district court discussed "Ms. Milligan's age" and the "turmoil in [her] life," and the court explained why it believed an eight-year sentence was still appropriate for protection of the public and deterrence—two of the purposes set forth in Section 3553(a) with which federal sentences must comply. Sentencing Hr'g Tr. 39–41, Supp. App. 240–42; *see* 18 U.S.C. § 3553(a)(2)(B), (C). Additionally, "[a] sentence within [the] properly calculated Guidelines range," like Milligan's sentence, "is entitled to a rebuttable presumption of reasonableness." *United States v. Law*, 528 F.3d 888, 902 (D.C. Cir. 2008) (quotation marks and citation omitted). Milligan fails to rebut that presumption.

\*   \*   \*   \*   \*

For the foregoing reasons, we affirm Milligan's convictions and sentence.

*So ordered.*

MILLETT, *Circuit Judge*, concurring in part, dissenting in part, and dissenting from the judgment: I agree with the majority opinion that Milligan's challenge to her conviction, as well as her substantive reasonableness challenge to her sentence, do not succeed. I part company, though, with the decision to affirm application of the sophisticated means sentencing enhancement. The Sentencing Commission explicitly confined the sophisticated means enhancement to criminal activity that is "*especially* complex or *especially* intricate[.]" U.S. SENT'G GUIDELINES MANUAL § 2B1.1 cmt. n.9 (U.S. SENT'G COMM'N 2021) (emphases added). Creating a fake email account and opening a UPS mailbox hardly even count as complex or intricate, let alone "especially" so.

## I

The United States Sentencing Guidelines provide for a two-level sentencing enhancement when an offense "involved sophisticated means." U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(10)(C) (U.S. SENT'G COMM'N 2021). The accompanying commentary explains that "sophisticated means" refers to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1 cmt. n.9. So the "sophisticated means" enhancement "requires more than the concealment or complexities inherent in fraud." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014). It requires much more: Not just complex, but "especially complex." Not intricate, but "especially intricate." Out of fidelity to the Commission's own words, sophistication must go above and beyond commonplace criminal activity and cover-ups.

The Sentencing Guidelines themselves provide additional guidance as to what constitutes "sophisticated means":

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another

> jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense *otherwise* involved sophisticated means[.]"

U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(10) (U.S. SENT'G COMM'N 2021) (emphasis added).

The structure of this Guideline requires us to read "sophisticated means" in light of the examples that precede it. That is because "sophisticated means" comes after the word "otherwise" at the end of a list of entries that trigger the same sentencing enhancement. The Supreme Court has read the word "otherwise," when used at the end of such a list, to introduce a residual clause that names a category into which conduct that parallels the preceding examples fall. *See Johnson v. United States*, 576 U.S. 591, 598 (2015) ("By asking whether the crime '*otherwise* involves conduct that presents a serious potential risk,' moreover, the residual clause forces courts to interpret 'serious potential risk' in light of the four enumerated crimes [that came before.]") (quoting 18 U.S.C. § 924(e)(2)(B)); *see also* 2A N. SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 47.17 (1991) ("Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."). In this way, sophisticated-means offenses must be in the same realm of complexity as the examples given. U.S. SENT'G GUIDELINES MANUAL § 2B1.1 cmt. n.9 (U.S. SENT'G COMM'N 2021); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 195 (2012) ("When * * * any words * * * are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them

similar. The canon especially holds that 'words grouped in a list should be given related meanings.'") (quoting *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977)).

This reading of the Guideline also comports with the congressional directive that gave life to the sophisticated-means provision. In the Telemarketing Fraud Prevention Act of 1998, Congress directed the Sentencing Commission to "provide an additional appropriate sentencing enhancement, if the offense involved sophisticated means, including but not limited to sophisticated concealment efforts, such as perpetrating the offense from outside the United States[.]" Pub. L. No. 105-184, § 6, 112 Stat. 520, 521; *see* U.S. SENT'G GUIDELINES MANUAL amend. 587, app. C, at 25 (Supp. 1998) ("This amendment responds to the [congressional] directives by * * * broaden[ing] the 'sophisticated concealment' enhancement to cover 'sophisticated means' of executing or concealing a fraud offense."). In citing the example of a fraud committed from "outside the United States," then, the Sentencing Commission was giving effect to the very level of sophistication called for by Congress.

In short, what counts as sophisticated means must be of a piece with the two examples provided in the Guideline—(A) relocating jurisdictions to avoid detection, or (B) committing the fraud from foreign land. These illustrative examples are variations on a theme in that they both involve operating or relocating a criminal scheme across multiple jurisdictions "to evade law enforcement or regulatory officials[.]" U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(10)(A) (U.S. SENT'G COMM'N 2021). Such sophisticated manipulations use specialized knowledge about regulatory schemes and law-enforcement operations in different locations to make policing and detection of the crimes more difficult.

The Guideline's commentary reinforces that the use of specialized knowledge or skills to conduct or cover up the fraud sits at the heart of "sophisticated means":

> For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S. SENT'G GUIDELINES MANUAL § 2B1.1 cmt. n.9 (U.S. SENT'G COMM'N 2021); *see also Stinson v. United States*, 508 U.S. 36, 38 (1993) (Guidelines commentary "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

For example, to structure a cross-jurisdictional fraud scheme, one must (i) understand the utility of dividing offices across jurisdictions, (ii) determine which jurisdictions' laws and law enforcement systems are most conducive to the conduct of fraud or its cover up, and (iii) have the wherewithal to act on that understanding. Likewise, to hide assets or transactions using "fictitious entities, corporate shells, or offshore financial accounts," one must possess a fairly technical understanding of legal and regulatory systems and the ability to utilize those systems to the advantage of the fraudulent scheme. Indeed, by employing the adverb "especially"—by employing it twice over—the Commission emphasized that "sophisticated means" reaches only those measures that go beyond the run-of-the-mill fraudulent or

deceptive actions undertaken by an ordinary hustler. *See Especially*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 776 (3d ed. 1993) (def. 2) ("particularly, notably, exceptionally"); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 396 (10th ed. 1996) (def 2) ("in particular: particularly"); *Especial*, WEBSTER'S NEW RIVERSIDE UNIVERSITY DICTIONARY 443 (2d ed. 1994) (def. 1) ("Standing above or apart from others: exceptional"); OXFORD ENGLISH DICTIONARY 395 (2d ed. 1989) ("In an especial manner; principally, chiefly").

## II

### A

Eleanor Milligan's fraud consisted of using her employer's payroll system to route paycheck funds into her own bank account. Milligan would keep open profiles of employees who had left GMSI's employ, input her own bank information, and collect the paychecks for herself.

One of those former employees was David Morgan. Because Milligan's fraud made it appear as though Morgan continued to work for and get paid by GMSI, the IRS contacted Morgan about missing W-2 forms for 2011 and 2012. Morgan got in touch with Milligan, who sent him corrected W-2 forms to resolve the problem.

Milligan's supervisor soon discovered that GMSI had continued to pay Morgan even after he left the company. To cover her tracks, Milligan told her supervisor that she had mistakenly failed to close out Morgan's account, leading to the extra paychecks. She then created an email address, "DavidMorgan647@Ymail.com," which she used to send emails purportedly from Morgan arranging to repay the money. To facilitate this repayment, Milligan opened a UPS mailbox

under the name "David Morgan Rental Properties." She then obtained checks bearing that name and mailbox address, which she used to reimburse GMSI.

After Milligan was convicted at trial, the district court concluded that Milligan's offense conduct amounted to the use of "sophisticated means," enhancing her sentence under Section 2B1.1(b)(10)(C) of the United States Sentencing Guidelines from a 57–71 month range to a 70–87 month range. The district court ultimately sentenced Milligan to 72 months in prison on the wire fraud charges.

**B**

There was nothing especially complex or especially intricate about Milligan's fraud or its cover up.

Milligan created a fake email account, which any middle schooler could do. *See* Sarah Perez, *Yahoo Mail's mobile app now does Caller ID, syncs photos*, TECHCRUNCH (Feb. 13, 2017, 2:08 PM), https://perma.cc/KFZ4-93B7 (placing just Yahoo Mail at 225 million users). She opened a mailbox with UPS, a routine errand. Sure, she made up a name of a company for the mailbox and for some checks to mask the reimbursements coming from her own account. In other words, she used a fake name. That is Avoiding Detection 101. How could she have covered her trail any more simply? Nothing she did entailed specialized skill or knowledge. It takes a stretch of the imagination even to call her steps complex. But they certainly were not "especially" complex or intricate. *See United States v. Archuletta*, 231 F.3d 682, 685–686 (10th Cir. 2000) (use of fake name and checks were "evidence of nothing more than the minimum conduct required to establish a violation of [bank fraud statute] in its simplest form").

The record shows, moreover, that Milligan's steps were an ad hoc and one-off scramble in response to almost being found out by her supervisor. She did not undertake similar measures for any of her other fraudulent check diversions. Her actions were isolated, and she simply reacted spontaneously when a threat to her actions arose. The government points to nothing suggesting this was a pre-planned aspect of the fraud offense itself. Yet the examples in the Guideline and accompanying commentary all involve sophistication in the form of foresight or at least of design for the fraudulent offense itself: A telemarketing scheme set up to operate in multiple jurisdictions to evade detection, transactions hidden by corporate shells, or offshore accounts set up in the first instance to obfuscate. The very foundations of these operations are imbued with sophisticated methods of concealment, complex enough to require some degree of planning. Meanwhile, Milligan scrambled to duct tape a leaky pipe.

That is not to say that after-the-fact steps at cover-up will never rise to the level of sophisticated means. It is rather the combination of run-of-the-mill measures slapped together with no evidence of foresight, planning, specialized skills, or technical knowledge that place Milligan's rudimentary cover-up far outside the realm of sophisticated means.

What is more, Milligan's efforts were entirely focused on escaping short-term scrutiny from her boss; they do not add up to an "offense" designed to "evade law enforcement or regulatory officials[.]" U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(10) (U.S. SENT'G COMM'N 2021).

The majority opinion asserts that Milligan created a fake entity in the name of "David Morgan Rental Properties" to register the mailbox and to avoid issuing the reimbursement

checks in her own name.  But making up a name and opening a checking account is not the same as creating a fake entity, not to mention creating and registering a corporate or other formal business entity, and then using that entity to conduct the fraud or launder profits, like the "corporate shells, or offshore accounts" referenced in the Guideline.  U.S. SENT'G GUIDELINES MANUAL § 2B1.1 cmt. n.9 (U.S. SENT'G COMM'N 2021).  The question under the Guideline is whether her "offense conduct" was especially complex or especially intricate, not whether routine efforts to cover up one instance of fraud in a decade-long scheme meet that standard.

The former, in fact, is precisely the question the Seventh and Second Circuits have answered in applying the Guidelines.  *See United States v. Allan*, 513 F.3d 712, 713–714, 715–716 (7th Cir. 2008) (conduct sophisticated where defendant enrolled in a Hewlett-Packard affiliate program, sought out an inside contact who provided information about Hewlett-Packard customers that defendant then used to structure and carry out a scheme that also involved the use of a falsified business name); *United States v. Lewis*, 93 F.3d 1075, 1082 (2d Cir. 1996) (defendant's conduct was sophisticated where he wrote "nearly 200 checks to non-existent businesses and charities during an eight-year period" that were deposited into "26 different bank accounts," and the funds then transferred from "these Satellite Accounts into Operational Accounts"); *contra* Majority Op. at 13.  The majority opinion, by contrast, asks only whether Milligan's far more rudimentary, isolated concealment efforts involved *anything* beyond "lies or omissions inherently bound up in her embezzlement[.] Majority Op. at 11.  It is no wonder the answer.

By contrast, consider *United States v. McCants*, 554 F.3d 155 (D.C. Cir. 2009).  There, we affirmed imposition of the sophisticated means sentencing enhancement where the

defendant "committed his [fraud] offense in multiple states and kept some of his false documents and device-making implements hidden in storage units rented under an alias. He also admit[ted] to using an allegedly legitimate business to conceal his offense from law enforcement." *Id.* at 163.

*McCants* involves perennial signs of sophistication that this case does not. McCants used specialized knowledge (in setting up a multistate fraudulent operation) and exploited the corporate form of a legitimate business entity to effectuate his scheme. *McCants*, 554 F.3d at 163. These steps were baked into the fabric of the operation; they were not ad hoc or limited in duration. *See id.* As the majority notes, "we do not assess the sophistication of a defendant's concealment actions piecemeal." Majority Op. at 10. Thus, although McCants did use an alias as part of his concealment efforts, that does not mean any alias itself constitutes sophisticated means. Instead, the fact that he operated across multiple jurisdictions and used a legitimate business for cover *from law enforcement* do critical work in the sophisticated means analysis.

Here, Milligan's use of David Morgan's name as an alias to cover up her fraudulent diversion of checks issued in his name is as sophisticated as her scheme got. She made up the name of a business, but did not loop into her plan a real, live business entity like McCants did. She reacted haphazardly to questions from her boss, but she did not coordinate concealment efforts from the start, like McCants did, or exploit multi-jurisdictional barriers to law enforcement. To say these efforts were "not inherent to her underlying offense[,]" Majority Op. at 11, ignores that avoiding detection is inherent in all frauds.

While the majority opinion (at 13) maintains that there is "no indication in our opinion that McCants used any kind of

specialized knowledge to set up (or carry out) his possession of fake ID implements," we specifically noted that McCants "committed his offense in multiple states," *McCants*, 554 F.3d at 163, which is what the Guideline itself uses to define sophisticated conduct. The same goes for McCants's use of his "legitimate business" as a boon for his efforts at concealment. *Id.* While the majority opinion downplays McCants' use of his own business in the fraud, our decision found it significant that McCants has used "an allegedly legitimate business to conceal his offense from law enforcement." *Id.*

To be sure, when law enforcement finally discovered McCants's criminal activity, they found among his effects "a pamphlet titled 'How to make driver's licenses and other ID's on your home computer.'" Majority Op. at 14 (quoting *McCants*, 554 F.3d at 158). But they also found "passports," "birth certificates[,]" "unfinished Social Security cards[,]" "and a paper file titled 'Bank Fraud Issues.'" *McCants*, 554 F.3d at 158. Law enforcement in this case produced evidence of an email account, a UPS mailbox, and some checks bearing the latter's address. There was no instruction manual, presumably because Milligan's tasks are not sophisticated enough to justify the ink.

Neither does the goal of deterrence push Milligan's actions across the line. Even assuming that sophisticated efforts at concealment necessitate heavier sentences to maintain the same deterrent effect (Majority Op. at 10–11), Milligan's simplistic use of one alias in one cover-up effort remains south of "especially complex." All agree that, to constitute sophisticated means, the defendant's efforts must go beyond routine cover-up measures. Oral Arg. Tr. at 28–29; Milligan Opening Br. 20. Yet it is hard to think of what less Milligan could have done to cover up her diversion of David Morgan's checks. By the same token, it is hard to imagine this

conduct made it any more difficult for law enforcement to sniff out the fraud. Notably, the district court made no such finding in applying the enhancement. So deterrence provides no justification for the sentencing enhancement in Milligan's case—and it certainly cannot cover up for the lack of sophistication in her means. Use of the enhancement here was just more punishment for punishment's sake.

We also must not forget that the Guidelines' interest in deterrence must be balanced against the equally important goal of proportionality. *United States v. Booker*, 543 U.S. 220, 264 (2005) (citing U.S. SENT'G GUIDELINES MANUAL § 1A1.1, cmt. n.3 (U.S. SENT'G COMM'N 2003)). Treating rudimentary efforts like Milligan's as "especially complex" threatens to dilute the Guideline standard to, essentially, any effort to avoid detection beyond a fib. While we owe the district court's determination due deference, we also must ensure that the boundaries set by the Guidelines' plain language—here, the need for "especially complex" or "especially intricate" conduct—are enforced. *See generally McCants*, 554 F.3d at 163.

As this court has said, the ability to "imagine scenarios involving more elaborate means to avoid detection or conviction does not render the district court's resolution of the question invalid." *McCants*, 554 F.3d at 163. The corollary must also be true. Just because one might be able to imagine a scenario involving less elaborate means does not make the steps Milligan employed especially complex, within the meaning of the Sentencing Guidelines.

* * * * *

Because I view the district court's decision as misapplying the "sophisticated means" enhancement, I would remand for

resentencing. For that reason, I respectfully concur in part, dissent in part, and dissent from the judgment.